Rodger A. **FREED**, Appellant

v.

**GEISINGER MEDICAL CENTER; and HealthSouth Corporation, formerly known as HealthSouth Rehabilitation Corporation, and HealthSouth of Nittany Valley, Inc., t/d/b/a Healthsouth Nittany Valley Rehabilitation Hospital, Appellees.**

Superior Court of Pennsylvania.

Argued March 15, 2006.
Filed Sept. 29, 2006.
Reargument Denied Dec. 1, 2006.

Jan S. Barnett, Lemoyne, for appellant.

Daniel E. Lohr, Danville, for Geisinger Medical Corp.

Kimberly A. Boyer–Cohen, Philadelphia, for Healthsouth Corp.

BEFORE: STEVENS, McCAFFERY, and PANELLA, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, Rodger A. Freed, appeals from the judgment of nonsuit granted in favor of Appellees, Geisinger Medical Center ("GMC") and HealthSouth Corporation ("HealthSouth"), in a professional negligence case alleging failure to meet the nursing standard of care for a paralyzed, immobilized patient. Specifically, Appellant asks us to determine whether the trial court erred by denying the admission of certain expert witness testimony into evidence, thereby precluding him from establishing a *prima facie* case. After thorough review, we reverse.

¶ 2 The relevant facts and procedural history underlying this matter are as follows. From November 6, 1998, to December 3, 1998, Appellant was hospitalized at GMC with spinal cord injuries suffered in an automobile accident, which rendered him a paraplegic. On December 3, 1998, he was transferred to HealthSouth for rehabilitation therapy. At some point, Appellant developed pressure wounds on his buttocks and sacrum. Due to the development of an infection in the pressure wound on his sacrum, he was returned to GMC on January 10, 1999, for therapy, including surgical debridement. He remained at GMC until February 24, 1999, when he was again transferred to HealthSouth. He was discharged to home on May 10, 1999.

¶ 3 Appellant filed a complaint on December 21, 2000, and an amended complaint on June 25, 2001, sounding in professional negligence against GMC and HealthSouth. The complaint alleged that the nursing staff of both institutions failed to meet the standard of nursing care with respect to pressure relief for a paralyzed, immobilized patient, which led to multiple pressure wounds, and resulted in lengthened periods of hospitalization and rehabilitation.

¶ 4 A jury trial commenced on September 23, 2003, with the first witness being Appellant's nursing expert, Linda Pershall. During direct examination, Nurse Pershall was asked to give her opinion as to the cause of Appellant's pressure wounds, and Appellees immediately objected. The trial court sustained the objection, ruling that because Nurse Pershall was not a medical doctor, she was not qualified to give a medical diagnosis. Appellant then requested permission to call his rehabilitation expert witness, Harry Schwartz, M.D., who had been scheduled as a rebuttal witness, to give testimony as to causation in Appellant's case-in-chief. The trial court denied Appellant's request on the grounds that Dr. Schwartz's proposed testimony did not possess a sufficient degree of medical certainty. Finally, to close his case-in-chief, Appellant read into evidence portions of the deposition testimony of Chad Brickley (a physician's assistant) and Robert Burns, M.D., both of whom had been involved in Appellant's care.

¶ 5 Appellees then motioned for entry of a compulsory nonsuit, pursuant to Pennsylvania Rule of Civil Procedure 230.1. The court granted Appellees' motion, holding that Appellant had failed to present a *prima facie* case of negligence, as he had not provided evidence of a causal connection between a breach in the standard of nursing care and the development or worsening of his pressure wounds.[1]

¶ 6 Appellant timely appealed, presenting three questions for our review:

  A. Did the Trial Court err as a matter of law in precluding [Appellant's] nurs-

---

1. Appellant's motion for post-trial relief to lift the nonsuit and grant a new trial was deemed denied by operation of law. *See* Pa.R.C.P. 227.4(1)(b).

ing expert witness from testifying as to the cause of [Appellant's] pressure injury, when: (1) it is clearly a nursing diagnosis rather than a physician's diagnosis; (2) the testimony was of record absent any timely defense objection; and (3) unfair surprise and prejudice was caused to [Appellant] when his nursing expert's expected testimony was of record for months before the trial began and [Appellees] failed to object to her expected testimony until the time of trial?

B. Did the Trial Court err as a matter of law, and abuse its discretion to the prejudice of [Appellant], in not allowing him to call his rebuttal expert witness out of turn in order to meet his prima facie case?

C. Did the Trial Court err as a matter of law in entering a compulsory nonsuit against [Appellant]?

(Appellant's Brief at 4). All of Appellant's questions are in essence allegations that the trial court's evidentiary rulings were in error and precluded Appellant from presenting expert witness testimony that would have established his *prima facie* case.

■ ¶ 7 When we review a ruling on the admission or exclusion of evidence, including the testimony of an expert witness, our standard is well-established and very narrow. These matters are within the sound discretion of the trial court, and we may reverse only upon a showing of abuse of discretion or error of law. "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 559, 839 A.2d 1038, 1046 (2003). In addition, "[t]o constitute re-

versible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *McClain v. Welker*, 761 A.2d 155, 156 (Pa.Super.2000) (citation omitted).

■ ¶ 8 Our standard in reviewing a trial court's entry of a nonsuit is also well-settled. An entry of a nonsuit is proper only if the fact-finder, viewing all the evidence in favor of the plaintiff and resolving any conflicting evidence in favor of the plaintiff, "could not reasonably conclude that the essential elements of a cause of action have been established." *McClain, supra* at 158 (citation omitted). The lack of evidence "must be so clear that it admits no room for fair and reasonable disagreement." *Id.* (citation omitted).

■ ¶ 9 To prevail in any negligence action, the plaintiff must establish the following elements: the defendant owed him or her a duty, the defendant breached the duty, the plaintiff suffered actual harm, and a causal relationship existed between the breach of duty and the harm. *McClain, supra* at 158. When the alleged negligence is rooted in professional malpractice, the determination of whether there was a breach of duty comprises two steps: first, a determination of the relevant standard of care, and second, a determination of whether the defendant's conduct met that standard. *Toogood v. Rogal*, 573 Pa. 245, 261, 824 A.2d 1140, 1149 (2003). Furthermore, to establish the causation element in a professional malpractice action, the plaintiff must show that the defendant's failure to exercise the proper standard of care caused the plaintiff's injury. *Id.* at 255, 261, 824 A.2d at 1145, 1149. Expert testimony is generally required in a medical malpractice action to establish several of elements: the proper standard of care, the defendant's failure to exercise that standard of care, and the causal relationship between the failure to

exercise the standard of care and the plaintiff's injury. *Id.* at 255, 824 A.2d at 1145.

¶ 10 In the case *sub judice*, the trial court focused on the causation element, holding that Appellant had not presented evidence of a causal connection between his pressure wounds and the alleged breaches in the standard of nursing care.[2] (Trial Court Opinion, filed 6/14/05, at 8–9). In the absence of any such evidence, Appellant could not establish a *prima facie* case for negligence, and the trial court therefore granted Appellees' motion for a compulsory nonsuit. Appellant attempts to refute the trial court's conclusion with each of his questions presented on appeal by arguing that the court erred by excluding certain expert testimony that would have provided evidence of the missing causal connection.

¶ 11 In his first issue, Appellant contends that the trial court erred in ruling that Ms. Pershall, Appellant's nurse expert witness, could not render an opinion as to the cause of Appellant's pressure wound. Had Nurse Pershall been permitted to do so, she would have testified that, in her opinion, Appellees' failure to adhere to the standard of nursing care for immobilized patients led to the development and worsening of Appellant's pressure wounds. (Notes of Testimony ("N.T."), 9/23/03, at 75). The trial court did accept Nurse Pershall as an expert witness with respect to the proper standard of nursing care for

an adult immobilized patient.[3] Hence, the only portion of Nurse Pershall's proffered testimony that is in dispute is the portion dealing with the medical causation of Appellant's pressure wounds.

¶ 12 In general, to qualify as an expert witness, one must only "possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience." *Flanagan v. Labe,* 547 Pa. 254, 257, 690 A.2d 183, 185 (1997); *see also* Pa.R.E. 702;[4] *McClain, supra* at 156 (noting that the standard for qualification of an expert witness is a liberal one). Thus, in determining whether to admit expert testimony, the usual test to be applied is "whether the witness has a reasonable pretension to specialized knowledge on the subject matter in question." *Flanagan, supra* at 257, 690 A.2d at 185.

¶ 13 Applying this broad standard for expert testimony to an issue of medical causation, this Court in *McClain, supra,* cited our Supreme Court for the proposition that "an otherwise qualified non-medical expert [may] give a medical opinion so long as the expert witness has sufficient specialized knowledge to aid the jury in its factual quest." *McClain, supra* at 157 (citing *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664 A.2d 525 (1995)). In *Miller,* our Supreme Court held that the trial court had abused its discretion in refusing as a matter of law to allow a coroner to testify as to time of death solely

2. No argument was offered or entertained as to whether a *prima facie* case had been presented as to the other elements of professional malpractice, *i.e.,* standard of care, breach of that standard, and injury to Appellant. The causation element is the only one at issue in the instant appeal.

3. Appellees did not contest Nurse Pershall's competence as an expert witness regarding the standard of nursing care appropriate for an adult, immobilized patient.

4. Rule 702 provides as follows:

> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702.

because he was not a physician. In reversing the trial court and allowing the coroner to testify, our Supreme Court noted that "a mortician of twenty[-]seven years, duly licensed by this Commonwealth, who has also served ... as county coroner for fifteen years, may have specialized knowledge regarding the time of death which would not otherwise be known to a lay individual." *Miller, supra* at 483, 664 A.2d at 529. Given the coroner's extensive experience and expertise, the high court concluded that his lack of formal medical training could not be a basis on which to exclude his testimony concerning time of death. *Id.*

¶ 14 Our Supreme Court's holding in *Miller* formed the basis for this Court's holding in *McClain, supra*, in which the expert testimony of a Ph.D. neuroscientist/psychobiologist was at issue. The plaintiffs-appellants in *McClain* were two minor children suffering from toxic lead poisoning, who had sued the owner of their rental unit alleging that the poisoning was due to ingestion of lead-based paint in their residence. The children sought to introduce the expert testimony of the Ph.D. neuroscientist/psychobiologist as evidence that they had experienced cognitive defects caused by lead poisoning. The

trial court had ruled that the proposed testimony regarding medical causation was not admissible because the expert witness did not possess a medical degree. This Court reversed, citing the witness's long and prestigious career in brain dysfunction related to toxins and diseases; his teaching, research, and writings on brain dysfunction; his position as head of the Laboratory of Electrophysiology at the New York State Institute for Basic Research in Developmental Disabilities; and his clinical practice in which he tested patients referred to him by neurologists and psychologists in order to determine the causes and extent of their cognitive disorders. *McClain, supra* at 157. In light of these eminent qualifications, this Court concluded that the trial court had erred in refusing to qualify the scientist as an expert witness regarding the causation of cognitive disorders solely because he lacked formal medical training. *Id.* at 157–58.

¶ 15 In the case *sub judice*, the trial court refused to allow Nurse Pershall to testify that breaches in the standard of nursing care had caused Appellant's pressure wounds. After thorough review and based on our liberal standard regarding expert testimony, we conclude that the trial court's ruling was erroneous.[5]

---

5. The trial court reasoned that Nurse Pershall's offered testimony on causation would constitute a medical diagnosis, which our Supreme Court has ruled is outside the competency of a nurse expert witness. *See Flanagan v. Labe*, 547 Pa. 254, 257–59, 690 A.2d 183, 185–86 (1997) (relying on the Professional Nursing Law, 63 P.S. §§ 211–225.5, which expressly excludes medical diagnosis from the definition of the practice of nursing, to hold that a nurse expert witness may not testify as to a medical diagnosis). Instantly, we cannot accept the trial court's rationale, since, after thorough review of all the circumstances surrounding this case, we conclude that no medical diagnosis was at issue.

The parties agree that Appellant suffered from pressure wounds—that was the undis-

puted diagnosis of the harm of which Appellant complained. Thus, the medical diagnosis of Appellant's harm was not at issue. The parties also agree that, by definition, the cause of pressure wounds is unrelieved pressure on a part of the body. What *is* disputed is whether a breach of the standard of nursing care for an immobilized patient proximately caused the unrelieved pressure that in turn caused Appellant's pressure wounds to develop and/or worsen. This question calls for an opinion on causation, akin to the causation issue in *McClain, supra*.

Contrary to Appellant's contention, a nursing diagnosis was not at issue in this case either. As our Supreme Court has stated, a "nursing diagnosis identifies signs and symptoms to the extent necessary to carry out the

¶ 16 Appellant proffered Nurse Pershall's testimony as evidence for the crucial causation issue in Appellant's case, *i.e.*, that breaches in the standard of nursing care were the cause of the development and/or worsening of Appellant's pressure wounds. In determining whether Nurse Pershall was competent to give expert testimony on this issue of medical causation, we must consider her qualifications in light of this Court's precedent in *McClain, supra* (holding that a Ph.D. scientist who was not a medical doctor could testify as to the causative relationship between ingestion of lead and cognitive defects).

¶ 17 At trial, Nurse Pershall was examined and cross-examined extensively as to her qualifications as an expert witness. She is a registered nurse, having received a Bachelor of Science degree in nursing from the University of New Mexico in 1974. She has worked in various hospitals and private facilities, including a rehabilitative nursing home where she gained experience with adult wound care and long-term rehabilitation. At present, she works an average of two shifts per week in a nursing home serving primarily geriatric Alzheimer's disease patients; in addition, she remains involved with a company that she founded, acting as a liaison to provide nursing experts for attorneys involved in litigation. At trial, Nurse Pershall was proffered by Appellant and accepted by defense counsel specifically as an expert in "nursing standards of care for long-term care facilities, adult hospital care and adult wound care." (N.T., 9/23/03, at 45).

¶ 18 Based on Nurse Pershall's qualifications as detailed above, we conclude that she is competent to provide expert testi-

mony not only on the standard of nursing care, but also on the causative relationship between breaches in the standard of care and Appellant's pressure wounds. Her education and experience provide her with "more expertise than is within the ordinary range of training, knowledge, intelligence, or experience" concerning the cause of pressure wounds. *Flanagan, supra* at 257, 690 A.2d at 185. Thus, we determine that the trial court abused its discretion by excluding her testimony as to causation of Appellant's pressure wounds.[6] Therefore, we reverse the trial court's decision and remand for trial.

¶ 19 Despite our holding of trial court error and the decision to remand for trial, we will address the other two issues raised by Appellant precisely because they are likely to arise on remand.

¶ 20 In his second question presented for our review, Appellant argues that the trial court erred by not permitting Appellant to present his rebuttal expert witness, Dr. Schwartz, out of turn, *i.e.*, during Appellant's case-in-chief. After the court had refused to allow Nurse Pershall to testify as to the cause of Appellant's pressure wounds, Appellant sought to present Dr. Schwartz's opinion testimony on the same issue. The trial court refused to permit Dr. Schwartz to testify based on its determination that Dr. Schwartz's opinions, as expressed in his two expert reports, were not expressed to any degree of medical certainty. (Trial Court Opinion at 8). After careful review, we conclude that the trial court did not abuse its discretion

nursing regimen. It does not, however, make final conclusions about the identity and cause of the underlying disease." *Flanagan, supra* at 258–59, 690 A.2d at 186. Thus a nursing *diagnosis* by definition *does not* encompass the cause of the underlying disease.

6. Because we conclude that the trial court erred in excluding Nurse Pershall's testimony on causation, we need not address the other two sub-parts of Appellant's first issue.

in refusing to accept Dr. Schwartz's testimony.

¶ 21 In order for opinion testimony of an expert witness to be admissible in a medical malpractice case, the testimony must be rendered within a reasonable degree of medical certainty. *Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa.Super.2004), *appeal denied*, 584 Pa. 698, 882 A.2d 1004 (2005). The trial court must look to the substance and the entirety of the testimony in order to determine whether it meets this standard. "That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty." *Id.* (citation omitted). The expert need not testify with absolute certainty or rule out all possible alternative causes of the plaintiff's injury. *Corrado v. Thomas Jefferson University Hospital*, 790 A.2d 1022, 1031 (Pa.Super.2001). However, the expert does *not* meet the required standard of certainty if he or she testifies "that the alleged cause 'possibly', or 'could have' led to the result ... or even that it was 'very highly probable' that it caused the result." *Id.* (citation omitted). If the expert witness fails to provide his or her opinions on a required element within a reasonable degree of medical certainty, then the plaintiff has not stated a *prima facie* case and a grant of nonsuit is proper. *Id.*

¶ 22 Applying these principles to the instant case, the trial court found that Dr. Schwartz's reports did not render an opinion on causation of Appellant's pressure wounds to the requisite degree of medical certainty. (Trial Court Opinion at 7–8). We note first that Dr. Schwartz's reports were limited to causation issues, and they did not profess to offer any opinion as to whether Appellees had deviated from the standard of nursing care during Appellant's hospitalizations and rehabilitation. The only evidence that Appellees had deviated from the standard of nursing care was provided by Nurse Pershall's testimony. However, Dr. Schwartz's reports did not refer to, mention, incorporate or cite Nurse Pershall's opinions, and indeed gave no indication that he was aware of the extent of deviations from the standard of care for which there was evidence.

¶ 23 Rather, many of Dr. Schwartz's statements regarding causation were quite general and did not implicate a breach in the standard of nursing care. For example, Dr. Schwartz's first report states that Appellant's "sacral pressure ulcer ... was due to prolonged pressure in the lower aspect of the sacrum produced by bedrest." (Dr. Schwartz's First Expert Report, dated December 26, 2002, at 4). While acknowledging that pressure ulcers are a common complication of spinal cord injury, Dr. Schwartz further stated that "position changes coupled with adequate nutritional supplementation and pressure redistribution cushioning ... can lessen the risk of pressure ulcer development." (*Id.* at 2). Notably, *no* statement in either of Dr. Schwartz's reports suggests that a breach in the standard of nursing care had led to the *initial development* of Appellant's pressure wounds.

¶ 24 With regard to the worsening or delayed healing of Appellant's pressure wounds, Dr. Schwartz's reports discuss a possible causative breach in the standard of nursing care only in a speculative way. In his first report, Dr. Schwartz opined that *"it is possible"* that treatments to relieve pressure could have prevented the worsening of Appellant's pressure wounds:

In this particular instance, if pressure release could have been maintained with an insidious [sic] adherence to a turning protocol, *it is possible* that [Appellant's] pressure ulcer might not have progress-

ed to the point where a more serious infection ensued.

(*Id.* at 2) (emphasis added).

With appropriate pressure relief following debridement of the necrotic tissue, *it is possible* that operative intervention might have been avoided.

(*Id.* at 3) (emphasis added). In his second report, Dr. Schwartz's opinions were no more definitive regarding a causal link between deviations from the standard of nursing care and Appellant's pressure wounds:

If adequate turning [of Appellant in bed] was performed and the wound worsened despite the standard of care, then the complication is simply a complication of his total hospitalization experience beginning at Geisinger Medical Center and would not then represent any breach of the standard of care. However, for any chance of healing to occur, the orders for turning had to be adhered to. If the [physician's] orders [for turning in bed every two hours] were not adhered to by the nursing staff, then the standard of care was not met and any chance for recovery of the wound was lost.

(Dr. Schwartz's Second Expert Report, dated July 1, 2003, at 4).

¶ 25 After painstaking review of the entirety of both of Dr. Schwartz's expert reports, we cannot conclude that the trial court abused its discretion in finding an insufficient degree of medical certainty regarding causation expressed therein. *At no point* did Dr. Schwartz opine that a specific deviation from the standard of nursing care, as attested to by Nurse Pershall or any other witness, *caused* the initial development or worsening of Appellant's pressure wounds. Dr. Schwartz did

opine that the chance for *recovery, i.e.,* healing, of the pressure wounds would have been lost *if* the physician's orders to reposition Appellant in bed every two hours had not been followed. However, it is important to note that Dr. Schwartz acknowledged repeatedly that he did not know if the repositioning orders had been followed.[7] Dr. Schwartz did not know if the repositioning orders had been ignored, if they had been followed on some or most occasions, or if they had been followed assiduously. His reports provided no indication whether he was aware of the extent or the number of deviations from the standard of care for which there was evidence of record. His only direct statement of a causal link between deviations from the standard of care and Appellant's pressure wounds was general and vague and not focused on or related to the specific deviations for which there was record evidence.

¶ 26 At this juncture, it is particularly important that we keep in mind our Supreme Court's recent reiteration of our standard of review regarding the admission of expert testimony. *Grady, supra* at 559, 839 A.2d at 1046. Our job is not to assess independently the proffered testimony, but rather to determine whether the trial court's decision to exclude it was unreasonable; impartial; based on prejudice, bias, or ill-will; or so lacking in support as to be clearly erroneous. *Id.* Particularly in light of this deferential standard of review, we are unable to conclude that the trial court erred in refusing to admit Dr. Schwartz's testimony.

¶ 27 In Appellant's final issue, he contends that two other expert witnesses, Chad Brickley (a physician's assistant) and Robert Burns, M.D., provided the causation testimony necessary to establish a

---

**7.** Dr. Schwartz based his opinions solely on his review of Appellant's medical records, as

he had not been involved in Appellant's care.

*prima facie* case of negligence. Appellant's counsel read portions of the deposition testimony of these two witnesses into evidence at trial. After careful review, we conclude that the testimony of these witnesses did not provide a causative link between acts or omissions of the nursing staff and the development or worsening of Appellant's pressure wounds. We discuss the most germane excerpts of testimony from Mr. Brickley and Dr. Burns below.

¶ 28 In relevant part, Mr. Brickley's testimony was the following:

[Counsel]: You also evaluated the mattress that [Appellant] was utilizing at HealthSouth, correct?

[Mr. Brickley]: I didn't get the name of it. I don't know exactly what it was. But I believe I asked the patient or had some documentation the time [sic]. He had been on some mattress, some air type mattress, the certain type I don't know.

\* \* \* \*

[Counsel]: ... why were you asking him about the mattress that was being used?

[Mr. Brickley]: ... the number one reason for having [a pressure] ulcer is pressure on [an area of the body] or not having adequate pressure relief to that area. So that is an important issue or important point in somebody's [sic] who is paraplegic and currently hospitalized for X number of weeks whose medical condition isn't improved yet. He's still in a rehab setting. So, he still needs strength and still needs time to get better. So ... me seeing somebody with a pressure ulcer knowing what kind of mattress they are laying [sic] on, what kind of, sort of wheelchair cushion they have, they are important pieces of information because if they are not helpful, if he's sitting on a hard substance or a pressure relief mattress that is not adequate, then he certainly won't get better.

[Counsel]: ... in your note that you read into the record you write [that] the current mattress is not effective. What do you mean by not effective?

[Mr. Brickley]: My examination showed his wound worsened between today versus when he first stated he developed this wound and his hospitalization prior. I mean, he basically has not shown improvement. It didn't get better. It didn't heal on its own. From our assessment the current pressure relief system he had was not the ideal.

[Counsel]: In terms of evaluating a patient for a pressure ulcer in the wound clinic ... would how often he is being turned be something you would want to know before making recommendations to the health care providers back at HealthSouth[?]

[Mr. Brickley]: I think it's important to know. But if the patient is getting turned every two hours, you know, and I make a recommendation[,] the patient can say I don't know how often I'm getting turned. Making a recommendation, you know, if they are doing it, fine, continue to. But I think it's important to know if a patient is sitting in his bed, laying [sic] there for six, seven hours or whatever. That needs to be dealt with. Needs to have improved turning.

[Counsel]: What did you know in terms of [Appellant] as to how often he was being turned at HealthSouth[?]

[Mr. Brickley]: I don't know. He didn't know. From my note I was unable to obtain the information.

\* \* \* \*

[Counsel]: Why were you recommending that [Appellant] be turned more frequently every two to four hours?

[**Mr. Brickley**]: To avoid a prolonged period of time of direct pressure on his sacrum.

[**Counsel**]: If I am understanding your recommendations correct[ly] ... with better pressure relief on the sacrum you are hoping to promote healing?

[**Mr. Brickley**]: Correct.

[**Counsel**]: So, if I'm understanding your plan, the low air mattress[,] the turning of the patient every two to four hours[,] and the wound care instruction, they were all geared towards healing this ulcer without the need for surgical intervention?

[**Mr. Brickley**]: Correct.

(N.T., 9/24/03, at 233–37).

¶ 29 Mr. Brickley's testimony clearly revealed that he was not well-informed about the wound care that Appellees had rendered to Appellant. Specifically, Mr. Brickley did not know what sort of pressure relief Appellant had been given, i.e., he did not know what type of mattress Appellant had been using, nor how frequently he had been repositioned in his bed. Given his lack of knowledge of Appellant's care, Mr. Brickley did not testify and could not have testified that specific deviations from the standard of care with regard to repositioning, type of mattress, or any other factors, had caused the development or worsening of Appellant's pressure wounds.

¶ 30 Indeed, at no point in his testimony did Mr. Brickley even mention a breach in the standard of nursing care, much less causatively link any specific breach to the development or worsening of Appellant's pressure wounds. Mr. Brickley simply deduced that Appellant's pressure relief had not been "ideal" from his observation that Appellant's pressure wounds were not healing. This deduction does not and cannot imply that a deviation in the standard of nursing care caused Appellant's pres-

sure wounds or delayed their healing. The standard of care is not measured against the ideal; hence Mr. Brickley's assessment that pressure relief was not "ideal" was not relevant to the question of whether a breach in the standard of nursing care had caused or delayed healing of Appellant's wound. Therefore, we must conclude that the trial court did not err in discounting Mr. Brickley's testimony with respect to the element of causation.

¶ 31 The testimony of Dr. Burns that was read into evidence at trial was very short. Specifically, he testified only that "pressure relief is the primary modality of therapy of a decubitus ulcer. You can do any other mobility you wish[,] but without pressure relief they [sic] won't get better." (N.T., 9/24/03, at 238). This exceedingly brief, general testimony does not provide *any* evidence as to a causal link between specific deviations from the standard of nursing care and Appellant's pressure wounds. Thus, we conclude that the trial court committed no error in discounting Dr. Burns's testimony.

¶ 32 In summary, after thorough review, we hold that the trial court did abuse its discretion in excluding Nurse Pershall's testimony on causation of Appellant's pressure wounds; hence, we reverse the judgment of nonsuit and remand for trial. In addition, we affirm the trial court's rulings with regard to the testimony of the other expert witnesses (Dr. Schwartz, Mr. Brickley, and Dr. Burns).

¶ 33 Judgment of nonsuit reversed. Jurisdiction relinquished.