971 A.2d 1202

**Rodger A. FREED, Appellee**

**v.**

**GEISINGER MEDICAL CENTER, and HealthSouth Corporation, formerly known as HealthSouth Rehabilitation Corporation, and HealthSouth of Nittany Valley, Inc., t/d/b/a/ HealthSouth Nittany Valley Rehabilitation Hospital, Appellants.**

Supreme Court of Pennsylvania.

Argued May 14, 2008.

Decided June 15, 2009.

234

Kim Kocher, Esq., White and Williams, L.L.P., Philadelphia, Daniel Eric Lohr, Esq., Geisinger System Services, Danville, for Geisinger Medical Center.

Timothy J. McMahon, Esq., John Jacob Hare, Esq., Marshall, Dennehey, Warner, Coleman & Goggin, P.C., Harrisburg, for HealthSouth Corporation.

Jan Sonja Barnett, Esq., for Rodger A. Freed.

George Gerasimos Rassias, Esq., Curran & Rassias, L.L.P., Media, for PA Trial Lawyers Association.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

### OPINION

Justice TODD.

In this negligence action, Geisinger Medical Center ("Geisinger") and HealthSouth Corporation, formerly known as HealthSouth Rehabilitation Corporation and HealthSouth of Nittany Valley, Inc., t/d/b/a HealthSouth Nittany Valley Rehabilitation Hospital ("HealthSouth"), appeal the order of the Pennsylvania Superior Court reversing the trial court's grant of a compulsory nonsuit in their favor and against Appellee Rodger A. Freed. Although on a basis different from that expressed by the Superior Court, we affirm.

On November 6, 1998, Freed was involved in a single-vehicle accident during which he suffered spinal cord injuries and was rendered paraplegic. Following the accident, Freed was hospitalized at Geisinger. On December 3, 1998, Freed was transferred to HealthSouth Nittany Valley Rehabilitation Hospital for rehabilitation therapy. While there, Freed developed pressure wounds, also known as bedsores, on his buttocks and sacrum. The pressure wounds ultimately became infected and, on January 10, 1999, Freed was returned to Geisinger for surgical debridement[1] and therapy. He remained at Geisinger until February 24, 1999, when he was again transferred to HealthSouth. On May 10, 1999, Freed was discharged to home.

On December 21, 2000, Freed filed a complaint against Geisinger and HealthSouth,[2] alleging that the nursing staff of both institutions failed to meet the nursing standard of care with regard to the treatment and prevention of pressure wounds on an immobilized patient. At a jury trial over which the Honorable Charles C. Brown, Jr. presided, Freed present-

1. Debridement is the process of removing lacerated, devitalized, or contaminated tissue, often through surgery.

2. Freed's complaint also named Geisinger Clinic, Richard C. Hale, DO, and Richard Allatt, M.D. as defendants. On December 6, 2001, the parties entered into a stipulation dismissing Geisinger Clinic, Hale, and Allatt from the case.

ed as an expert witness Linda D. Pershall, a registered nurse, to testify regarding the relevant nursing standard of care, as well as to causation. During direct examination, when Freed's counsel asked Pershall her opinion as to the cause of Freed's bedsores, Geisinger objected, and the trial court sustained the objection on the basis that Pershall was not a medical doctor and, therefore, was not qualified to give a medical diagnosis.[3] After Freed presented his case, Geisinger moved for a compulsory nonsuit on the basis that Freed failed to present a *prima facie* case of negligence by not offering competent evidence of a causal connection between the alleged breach of the nursing standard of care and the development or worsening of Freed's pressure wounds, and the trial court granted the motion. In its opinion written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the trial court, citing this Court's decision in *Flanagan v. Labe*, 547 Pa. 254, 690 A.2d 183 (1997), reasoned that Pershall was not qualified to offer an opinion as to the cause of Freed's pressure wounds because an opinion regarding the specific cause and identity of an individual's medical condition constitutes a medical diagnosis, which a nurse is prohibited from making under the Professional Nursing Law, 63 P.S. §§ 211 *et seq.*[4]

3. Freed also sought to call his rehabilitation expert witness, Harry Schwartz, M.D., who had been scheduled as a rebuttal witness, to give testimony as to causation in Freed's case-in-chief; however, the trial court denied Freed's request on the basis that Dr. Schwartz's proposed testimony did not possess a sufficient degree of medical certainty. The trial court's order in this regard is not at issue in this appeal.

4. Specifically, Section 212 of the Professional Nursing Law provides, in relevant part:

(1) "The 'Practice of Professional Nursing' " means diagnosing and treating human responses to actual or potential health problems through such services as casefinding, health teaching, health counseling, and provision of care supportive to or restorative of life and well-being, and executing medical regimens as prescribed by a licensed physician or dentist. The foregoing shall not be deemed to include acts of medical diagnosis or prescription of medical or therapeutic or corrective measures, except as may be authorized by rules and regulations jointly promulgated by the State Board of Medicine and

On appeal to the Superior Court, Freed argued, *inter alia*, that the trial court erred in precluding Pershall from testifying as to the cause of Freed's pressure wounds. In a published opinion, the Superior Court reversed the trial court's grant of a nonsuit, holding that Pershall was competent to provide expert testimony on both the standard of nursing care and the issue of causation. Appellants now argue that the Superior Court's holding is in conflict with this Court's holding in *Flanagan,* and, therefore, must be vacated.

▉ Preliminarily, we note that in order to establish a cause of action for medical malpractice, a plaintiff must demonstrate (1) a duty owed by the physician to the patient; (2) a breach of that duty by the physician; (3) that the breach was the proximate cause of the harm suffered; and (4) that the damages suffered were a direct result of the harm. *Hightower–Warren v. Silk,* 548 Pa. 459, 463, 698 A.2d 52, 54 (1997). Expert testimony generally is required in a medical malpractice action in order to establish the proper standard of care, the defendant's failure to exercise that standard of care, and the causal relationship between the failure to exercise the standard of care and the plaintiff's injury. *Id.*

▉ In order to qualify as an expert witness in a given field, a witness normally need only possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience. *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 481, 664 A.2d 525, 528 (1995). Thus, ordinarily, "the test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation." *Id.* at 480, 664 A.2d at 528 (emphasis original).

the Board, which rules and regulations shall be implemented by the Board.

* * *

**(4)** **"Diagnosing"** means that identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen.
63 P.S. § 212(1) and (4). "Board" means the State Board of Nursing. 63 P.S. § 212(2).

In *Flanagan*, the appellant filed a medical malpractice action against the appellee, John F. Kennedy Memorial Hospital, alleging that he received substandard nursing care when he went to the hospital for treatment of a collapsed lung. The treatment involved the insertion of a tube into Flanagan's chest wall. According to Flanagan, following the insertion of the tube, the hospital's nursing staff failed to document his complaints of pain and responses to medication, and failed to monitor his breathing and palpate his chest, measures which would have led to earlier detection of the onset of subcutaneous emphysema. He asserted that the nursing staff's negligent care caused his condition to worsen.

At trial, Flanagan planned to introduce expert testimony of a registered nurse, who, in accordance with her expert report, intended to testify that "it is my nursing expert opinion, to a reasonable degree of nursing certainty, that all of the nurses ... did not meet the standard with respect to their nursing care of Stephen Flanagan and as such were a substantial contributing factor in his progressively worsening subcutaneous emphysema." 547 Pa. at 256, 690 A.2d at 184–85. The hospital filed a pre-trial motion *in limine* to preclude the nurse from testifying as to the identity of Flanagan's medical condition and the causes thereof. The trial court granted the motion, concluding that the nurse's testimony went not only to the proper standard of nursing care—an appropriate subject for her testimony—but also to a medical opinion regarding the ultimate effect of that care, which the court determined called for a medical diagnosis that the nurse was statutorily precluded from rendering under the Professional Nursing Law. Finding that the exclusion of this testimony prevented Flanagan from establishing a *prima facie* case of malpractice, the trial court granted summary judgment in favor of the hospital. The Superior Court subsequently affirmed the trial court's order.

In affirming the Superior Court's decision on appeal, we first acknowledged that the nurse was well educated, highly experienced, and competent to provide expert testimony regarding applicable standards of nursing care. We also deter-

mined the nurse was qualified to offer opinion testimony regarding whether the nursing procedures followed in Flanagan's case were substandard. *Id.* at 257, 690 A.2d at 185. We held, however, that she was precluded from offering a medical opinion on the effect of the alleged substandard nursing procedures because "the normal test of competency is constrained by [the Professional Nursing Law] limiting the deemed competency of nurses." *Id.*

In the instant case, the Superior Court distinguished *Flanagan* on the basis that Pershall's testimony did not constitute a medical diagnosis. In doing so, the Superior Court found that the parties (1) agreed on the relevant medical diagnosis, i.e. pressure wounds; and (2) agreed that "by definition, the cause of pressure wounds is unrelieved pressure on a part of the body." *Freed v. Geisinger Med. Ctr.*, 910 A.2d 68, 74 n. 5 (Pa.Super.2006).[5] The Superior Court thus opined that the only issue in dispute was "whether a breach of the standard of nursing care for an immobilized patient proximately caused the unrelieved pressure that in turn caused Appellant's pressure wounds to develop and/or worsen," an issue on which Pershall should not have been precluded from testifying. *Id.* Upon review, we conclude that the Superior Court's holding is, in fact, in conflict with *Flanagan.*

In concluding that Pershall's "education and experience provide her with 'more expertise than is within the ordinary range of training, knowledge, intelligence, or experience' concerning the cause of pressure wounds," and, as a result, that she was "competent to provide expert testimony not only on the standard of nursing care, but also on the causative rela-

---

5. Appellants object to the Superior Court's statement that it was undisputed that Freed sustained a pressure wound that was the result of unrelieved pressure on his body. While Appellants concede Freed "suffered from decubitus ulcers and an infection that required surgical debridement and other treatment," they maintain that the ulcer was neither avoidable, nor related to the care he received from Appellants. Appellants' Brief at 8. Appellants also point out that in Freed's amended complaint, he conceded that "malnutrition, metabolic abnormalities, and bacteria, in addition to inadequate repositioning, may have caused or contributed to the formation and/or progression of the ulcer." *Id.* In light of our holding, we need not address Appellants' arguments in this regard.

tionship between breaches in the standard of care and [Freed's] pressure wounds," *Freed,* 910 A.2d at 75, the Superior Court relied on this Court's holding in *Miller, supra,* and its own decision in *McClain v. Welker,* 761 A.2d 155 (Pa.Super.2000).

In *McClain,* the parents of two minor children filed a negligence action against their landlords, alleging the children suffered toxic lead poisoning as a result of ingesting lead-based paint from their rental home. The landlords filed a motion *in limine* to preclude the parents' expert, a scientist who had a Ph.D., but was not a medical doctor, from testifying as to the causal relationship between ingestion of lead and cognitive defects. Purportedly relying on *Flanagan* "for the proposition that only medical doctors could testify as to causation," 761 A.2d at 157, the trial court concluded that because the scientist did not have a medical degree, he was not qualified to testify as to medical causation, and granted the landlords' motion *in limine.* Thereafter, the trial court granted the landlords' motion for a compulsory nonsuit.

The Superior Court reversed on appeal, finding the trial court's reliance on *Flanagan* misplaced, in that, unlike the parents' proffered expert, "the nurse in *Flanagan* never asserted that she had any pretension to specialized knowledge related to medical causation." *McClain,* 761 A.2d at 157. Concluding that the scientist, like the coroner in *Miller, supra,* " 'possesse[d] more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience,' in his specialized fields of study," the *McClain* court held the scientist should have been permitted to render an expert opinion "within the guise of Pa.R.E. 702 as to the causation of cognitive disorders." *Id.* at 157–58.

We question the *McClain* court's rationale for distinguishing *Flanagan* in two respects. First, the Superior Court's characterization of the reason the proffered testimony in *Flanagan* was rejected is inaccurate: this Court in *Flanagan* held that the nurse was precluded from testifying *not because she did not possess specialized knowledge regarding the cause of Flanagan's condition,* but because the "normal test of

competency is constrained by a statutory provision limiting the deemed competency of nurses." *Flanagan*, 547 Pa. at 257, 690 A.2d at 185. In addition, it was unnecessary for the *McClain* court to distinguish *Flanagan* on the basis of the difference between the proffered witness' expertise; indeed, *Flanagan* did not preclude the scientist's testimony in *McClain* because the scientist *was not a registered nurse.*

█ Notwithstanding our concerns with the Superior Court's analysis in *McClain*, the distinction between *Miller* and *McClain* and the instant case is the fact that the expert witnesses in both *Miller* and *McClain* were not nurses who, according to this Court's holding in *Flanagan*, are expressly prohibited from making a medical diagnosis by the Professional Nursing Law. Accordingly, we find merit to Appellants' argument that the Superior Court's decision is in conflict with this Court's decision in *Flanagan* because it allowed Pershall, a registered nurse, to testify as to medical causation regarding Freed's pressure wounds. Nevertheless, after a thorough review of the relevant case law, as well as the Professional Nursing Law, we conclude, for the reasons discussed below, that this Court's decision in *Flanagan*, to the extent it prohibits an otherwise competent and properly qualified nurse from giving expert opinion testimony in a court of law regarding medical causation, is flawed and must be overturned.

As noted above, in order to qualify as an expert witness in a given field, a witness need only possess greater expertise than is within the ordinary range of training, knowledge, intelligence, or experience. *Miller*, 541 Pa. at 481, 664 A.2d at 528. In *Miller*, the decedent was killed in an automobile accident following a day of consuming alcoholic beverages with friends. The decedent's estate filed an action under the Dram Shop Act [6] against the owner of a tavern the decedent had patronized for several hours shortly before the fatal accident, alleging the tavern had served the decedent alcohol while he was visibly intoxicated. At trial, the estate called the county coroner, who was not a physician and did not have a medical

6. 47 Pa.C.S.A. §§ 4–493, 4–497.

degree, to testify based on his investigation of the accident scene. The tavern owner objected to the portion of the coroner's testimony that would have constituted expert opinion, including his opinion as to the time of the decedent's death, and the trial court sustained the objection. At the conclusion of trial, the trial court entered judgment in favor of the tavern owner, noting that even though the estate had proven by a fair preponderance of the evidence that the tavern had served the decedent while he was visibly intoxicated, by failing to establish the time of death the estate failed to establish a causal link between the negligence of the tavern owner and the fatal accident. The Superior Court affirmed, noting an absence of case law to support a finding that a lay coroner could be qualified to render an opinion as to time of death.

This Court reversed the Superior Court's decision, explaining:

the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has **any** reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. It is also well established that a witness may be qualified to render an expert opinion based on training and experience. Formal education on the subject matter of the testimony is not required, nor is it necessary that an expert be a licensed medical practitioner to testify with respect to organic matters. It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience.

*Id.* at 480–81, 664 A.2d at 528 (emphasis original and citations omitted). We concluded:

We ... believe that a mortician of twenty seven years, duly licensed by this Commonwealth, who has also served in the dual capacity as county coroner for fifteen years, may have

specialized knowledge regarding the time of death which would not otherwise be known to a lay individual. Consequently, we hold that the refusal to qualify Coroner Wetzler as an expert witness based solely upon his lack of formal medical training was an abuse of discretion.

*Id.* at 483, 664 A.2d at 529.

Two years after *Miller,* however, in *Flanagan,* this Court narrowed the well-established liberal standard for expert testimony in those cases involving nurses offered as experts. In a brief opinion authored by then-Chief Justice Flaherty, this Court determined that "a well educated and highly experienced nurse who is competent to provide expert testimony regarding applicable standards of nursing care" was nonetheless prohibited from offering an expert opinion regarding the ultimate effect of substandard nursing care:

[A]lthough the [Professional Nursing Law, 63 P.S. § 212,] permits nurses to diagnose human responses to health problems, it expressly prohibits them from providing medical diagnoses. Hence, it recognizes a firm distinction between a nursing diagnosis and a medical diagnosis.

The proper scope of a nursing diagnosis is set forth through statutory definitions of the terms employed in 63 P.S. § 212(1), *supra.* "Diagnosing" is defined as "identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen." 63 P.S. § 212(4). "Human responses" are defined as "those signs, symptoms and processes which denote the individual's interaction with an actual or potential health problem." 63 P.S. § 212(6). Thus, a nursing diagnosis identifies signs and symptoms to the extent necessary to carry out the nursing regimen. It does not, however, make final conclusions about the identity and cause of the underlying disease.

*Id.* at 257, 690 A.2d at 185–86 (emphasis omitted and footnote omitted).

█ Significantly, the Court in *Flanagan* did not provide any support for its conclusion that the restrictions contained in

the Professional Nursing Law apply in a court of law, or, more specifically, that a single provision of that law operates to limit the well established liberal standard for qualification of expert witness testimony that exists in this Commonwealth. Indeed, the title of the statute is the "Professional Nursing Law," and the first words of the statute refer to the "Practice of Professional Nursing." 63 P.S. § 212(1). This practice is defined as "diagnosing and treating human responses to *actual or potential health problems.*" 63 P.S. § 212(1) (emphasis added). Furthermore, "diagnosing" is defined under Section 212(4) as the "identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the *nursing regimen.*" (emphasis added). Thus, it is in the context *of the practice of nursing* in which a nurse is precluded from making a medical diagnosis. Expert testimony offered in a court of law does not implicate a nursing regimen; there is no patient under treatment, no actual or potential health problem, no diagnosis or treatment, and no care is affected. Rather, the expert is offered merely to opine on past events or hypotheticals with respect to a case before the court.

Moreover, there is no language whatsoever in the statute to suggest that the principles governing the actual *practice* of nursing are applicable in the distinct *legal arena* of malpractice or negligence actions, which is governed by the Rules of Evidence and the Rules of Civil Procedure. Had the legislature intended that the Professional Nursing Law supersede the common law and duly enacted rules with regard to the standard for admission of expert testimony, it could have expressly indicated this intention, as it subsequently did in its enactment of the Medical Care Availability and Reduction of Error Act ("MCARE Act"), 40 P.S. §§ 1303.101–1303.910, which, *inter alia,* made substantial changes in the requirements for qualifying an expert witness in medical professional liability actions. *See, e.g.,* 40 P.S. § 1303.512(a) (*"No person shall be competent to offer an expert medical opinion* in a medical professional liability action against a physician *unless* that person possesses sufficient education, training, knowledge

and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable." (emphasis added)). With this language, the MCARE Act expressly raised the standard for qualifying an expert witness in a medical professional liability action from that which existed under common law.

Finally, as we recognized in *Miller*, in the context of legal proceedings, if a witness has any reasonable pretension to specialized knowledge on the relevant subject, he may be offered as an expert witness, and the weight to be given his testimony is for the trier of fact to determine. Rule 702 of the Pennsylvania Rules of Evidence also provides that "a witness qualified as an expert by knowledge, skill, experience, training or education may testify." Pa.R.E. 702. Under *Flanagan*, however, a nurse duly qualified under Rule 702, but licensed under 63 P.S. § 216, is precluded from offering expert testimony on medical causation, while presumably a non-licensed nurse, *or any other individual*, with the same knowledge or experience would be permitted, under the broad common law standard for expert testimony, to offer such testimony. Neither the legislature nor this Court could have intended such an incongruous result.

Perhaps in an attempt to deal with this incongruity, the lower courts of this Commonwealth repeatedly have distinguished and/or carved out exceptions to *Flanagan*. As noted above, for example, the Superior Court in the instant case determined, erroneously, that Pershall's testimony was not precluded under *Flanagan* because the parties agreed on the relevant medical diagnosis, namely, pressure wounds. Most recently, in *Commonwealth v. Jennings*, 958 A.2d 536, 540 (Pa.Super.2008), the Superior Court held that the trial court properly allowed a sexual assault nurse examiner who performed a rape kit on a victim the morning after a sexual assault to offer at trial her opinion as to the cause of the victim's vaginal redness. The appellant maintained at trial that his sexual relations with the victim were consensual; the nurse, however, testified that the victim's vaginal redness was consistent with forced vaginal intercourse from behind. The

Superior Court distinguished *Flanagan*, holding the nurse's testimony constituted a nursing diagnosis that "was essential to the effective execution and management of the nursing regimen," as opposed to a medical diagnosis. *Id.* at 540. The *Jennings* court cited its own decisions in *Freed* and *McClain* as support for its holding, and further stated: "We find persuasive the decisions of the respected courts of other states [which] have held that sexual assault nurse examiners are qualified to testify as expert witnesses to the causation of injuries to victims of sexual crimes." *Id.* at 541.[7]

 Despite our conclusion that *Flanagan* is inherently flawed, we are loathe to reverse our own prior decisions, as such action necessarily implicates the great principle of *stare decisis*. The "rule of *stare decisis* declares that for the sake of certainty, a conclusion reached in one case should be

7. Specifically, the Superior Court cited *Newbill v. State*, 884 N.E.2d 383 (Ind.App.2008); *Rodriguez v. State*, 281 Ga.App. 129, 635 S.E.2d 402 (2006); *State v. Fuller*, 166 N.C.App. 548, 603 S.E.2d 569 (2004); and *Velazquez v. Commonwealth*, 557 S.E.2d 213 (Va.2002). We note that, of those cases, only North Carolina has a nursing statute similar to Pennsylvania's, in that it generally prohibits a nurse from making a medical diagnosis. *See* N.C.G.S.A. § 90–171.20(7)(e) defining the practice of nursing to include, *inter alia*, "[c]ollaborating with other health care providers in determining the appropriate health care for a patient but, subject to the provisions of G.S. 90–18.2, *not prescribing a medical treatment regimen or making a medical diagnosis*, except under supervision of a licensed physician." (emphasis added). However, consistent with our decision herein, it does not appear that the North Carolina nursing statute has been interpreted to preclude an otherwise-qualified nurse from offering expert testimony. For example, in *State v. Fuller*, the defendant, who was on trial for rape, objected to the admission of expert testimony by a sexual assault nurse examiner who examined the eleven-year-old victim the morning after she was sexually assaulted by the defendant. The trial court allowed the nurse to be qualified as an expert and testify that her examination of the victim "presented conditions consistent with vaginal penetration." 603 S.E.2d at 577. On appeal, the defendant challenged the trial court's admission of the nurse's testimony on the grounds that the nurse failed to meet the second prong of the state's tripartite test for evaluating the admissibility of expert testimony, namely, that the witness qualified as an expert in the area of the proposed testimony. After setting forth the nurse's education and experience, including experience examining victims of sexual assaults, the appellate court ultimately held that the trial court properly found her qualified to testify as an expert. The nursing statute was not raised as an impediment to the nurse's testimony.

applied to those which follow, if the facts are substantially the same, even though the parties may be different." *Commonwealth v. Tilghman*, 543 Pa. 578, 588 n. 9, 673 A.2d 898, 903 n. 9 (1996). As the United States Supreme Court explained in *Hohn v. United States*, 524 U.S. 236, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998), *stare decisis* is "the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Id.* at 251, 118 S.Ct. 1969 (quoting *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)).

However, as Chief Justice Castille explained in his opinion in support of affirmance in *Commonwealth v. Persichini*, 558 Pa. 449, 737 A.2d 1208 (1999):

> "the doctrine of *stare decisis* is not a vehicle for perpetuating error, but rather a legal concept which responds to the demands of justice and, thus, permits the orderly process of the law to flourish." ... We should not follow a governing decision that is unworkable.... Moreover, the policy considerations supporting *stare decisis* are less compelling when the issue involves a question of procedure. *See Hohn v. United States*, [524 U.S. 236, 118 S.Ct. 1969 (1998) ] ("The role of *stare decisis* ... is ... reduced in the case of a procedural rule which does not serve as a guide to lawful behavior.").

*Id.* at 456–57, 737 A.2d at 1212.

With due consideration to the doctrine of *stare decisis,* and upon reflection, we conclude: (1) the ruling in *Flanagan* conflicts with the Commonwealth's well established liberal standard regarding expert testimony; (2) *Flanagan* contains no support for the application of the Professional Nursing Law to the rules governing expert testimony in a court of law; and (3) *Flanagan's* incongruous holding has led to ill-supported attempts by lower courts to distinguish and carve out exceptions to the rule. Furthermore, *Flanagan* concerns an evidentiary issue, analogous to a question of procedure, the

answer to which does not favor one class of litigants over another. *Cf. George v. Ellis,* 911 A.2d 121 (Pa.Super.2006) (delineation of qualifications that a medical expert is required to possess under the MCARE Act does not affect the substantive rights of a party, but merely affects the procedural avenue by which a party may attempt to enforce those rights), *appeal denied,* 592 Pa. 767, 923 A.2d 1174. Accordingly, the role of *stare decisis* is diminished. *See Hohn,* 524 U.S. at 251–52, 118 S.Ct. 1969. For these reasons, we hold that our decision in *Flanagan,* to the extent it prohibits an otherwise competent and properly qualified nurse from giving expert opinion testimony regarding medical causation, must be overruled.[8]

**8.** We recognize that our decision to overrule *Flanagan* may have limited impact in light of the legislature's enactment of the MCARE Act, which became effective on May 19, 2002 and resulted in substantial changes in the requirements for qualifying an expert witness in medical professional liability actions. Specifically, Section 1303.512 of the MCARE Act provides:

(a) **General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

(b) **Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

(c) **Standard of care.**—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

We must now consider the impact of our decision to over-rule *Flanagan* on the instant case. We have explained that "[w]hen this Court issues a ruling that overrules prior law, expresses a fundamental break from precedent, upon which litigants may have relied, or decides an issue of first impression not clearly foreshadowed by precedent, this Court announces a new rule of law." *Fiore v. White*, 562 Pa. 634, 643, 757 A.2d 842, 847 (2000). Our decision to overrule *Flanagan* necessarily constitutes a new rule of law, as it overrules prior law and expresses a fundamental break from precedent.

Thus, we must next determine whether the new rule applies retroactively or prospectively. *See, e.g., Kendrick v. District Atty. of Philadelphia Cty.*, 591 Pa. 157, 172, 916 A.2d 529, 539 (2007). Whether a state court decision announcing a new rule of law should be applied retroactively or

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

(d) **Care outside specialty.**—A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

(e) **Otherwise adequate training, experience and knowledge.**—A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

However, there are certainly situations in which it is questionable whether the MCARE Act will apply and thus we conclude our decision today retains its vitality. For example, the MCARE Act, by its terms, appears to apply only to medical professional liability actions against physicians, and not to other professional liability actions, or to actions against non-physician health care providers. In addition, it is not at all clear that the MCARE Act would apply in criminal cases, such as *Jennings, supra*.

In the instant case, Freed's trial commenced on September 23, 2003, after the effective date of the MCARE Act. The record reveals, however, that Appellants did not argue the application of the MCARE Act to the Superior Court, nor in their brief to this Court.

prospectively is a matter within the judicial discretion of the court. *Id.* In resolving this issue,

> the major considerations must be: (1) whether the holding involves an interpretation of a statute or some other source of law; and (2) whether the issue is substantive or procedural. Logically, courts have greater control over questions of retroactivity or prospectivity if the "rule" is of the court's own making, involves a procedural matter, and involves common law development. On the other hand, courts should have the least flexibility where ... the holding at issue both: (a) involves an interpretation of a statute; and (b) far from involving a mere procedural matter, is a statute which defines criminal conduct.

*Id.* at 172–73, 916 A.2d at 539.

Although based on an interpretation—which we deem to be flawed—of a statute, the Professional Nursing Law, the *Flanagan* rule prohibiting an otherwise qualified licensed nurse from testifying as to medical causation nevertheless served only to alter the existing common law with regard to expert testimony, akin to a procedural ruling. Moreover, the holding in *Flanagan* did not purport to define criminal conduct. As a result, under *Kendrick,* we find that the instant decision in which we overrule *Flanagan* may properly be applied retroactively to Freed's case, and, in our discretion, we decide to do so.

 Accordingly, although we conclude the Superior Court's decision in the instant case conflicts with *Flanagan,* we nonetheless hold that Appellants are not entitled to relief because we hereby overrule *Flanagan* and apply our decision retroactively. Therefore, we affirm the Superior Court's order reversing the trial court's grant of a compulsory nonsuit in favor of Appellants and remanding for trial. On remand, the trial court should assess the competency of any expert witness under the standards previously set forth by this Court in *Miller, supra,* or under the MCARE Act, if applicable.

Order affirmed.

Justice McCAFFERY did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justice BAER join the opinion.

Justice EAKIN files a dissenting opinion in which Justice SAYLOR joins.

Justice EAKIN, dissenting.

I respectfully dissent. I would find the Superior Court's holding conflicts with *Flanagan v. Labe*, 547 Pa. 254, 690 A.2d 183 (1997), which held a nurse is precluded from offering expert opinion testimony regarding a medical diagnosis, thereby extending the constraints of The Professional Nursing Law [1] to the courtroom.

The Superior Court noted Pennsylvania's liberal standard for qualifying an expert witness, set forth in Pa.R.E. 702, and the application of this standard in qualifying non-medical expert witnesses to give medical opinions. *Freed v. Geisinger Medical Center*, 910 A.2d 68, 73–74 (Pa.Super.2006) (citing *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 664 A.2d 525, 529 (1995) (holding coroner with years of experience had specialized knowledge regarding time of death and qualified as expert to testify regarding same) and *McClain v. Welker*, 761 A.2d 155, 157–58 (Pa.Super.2000) (holding neuroscientist qualified as expert to testify regarding causation of cognitive disorders)).

In concluding the trial court's refusal to qualify Nurse Pershall as an expert witness was improper, the Superior Court framed the issue as "whether a breach of the standard of nursing care for an immobilized patient proximately caused the unrelieved pressure that in turn caused [Appellee]'s pressure wounds to develop and/or worsen[,]" similar to the causation issue in *McClain*. *Freed*, at 74 n. 5. The court held Pershall was qualified to give expert testimony "on the causative relationship between breaches in the standard of care and [Appellee]'s pressure wounds" because "[h]er education

1. 63 P.S. § 211 *et seq.*

and experience provide[d] her with 'more expertise than is within the ordinary range of training, knowledge, intelligence, or experience' concerning the cause of pressure wounds." *Id.*, at 75 (citing *Flanagan*, at 185). The Superior Court's attempt to distinguish *Flanagan* on the basis a medical diagnosis was not at issue was erroneous, as medical causation of Appellee's pressure wounds was clearly at issue, constituting a medical diagnosis. Thus, I agree with the majority to the extent it found the Superior Court's holding contravenes *Flanagan*. Majority Op., at 242–43, 971 A.2d at 1207.

Unlike the majority, however, I would uphold *Flanagan* because it deferred to the Professional Nursing Law's limitations, and acknowledged nurses are competent to provide testimony regarding applicable standards of *nursing care*. *Flanagan*, at 185 (emphasis added). The nurse in *Flanagan* was precluded from rendering an expert medical opinion because "the normal test of competency is constrained by a statutory provision limiting the deemed competency of nurses." *Id. Flanagan* reasoned nurses may not testify concerning a medical diagnosis because the Professional Nursing Law expressly prohibits them from doing so. *Id.*, at 186; 63 P.S. § 212(1), (4). Despite Pennsylvania's liberal standard for the admission of expert testimony, because the legislature has prohibited nurses from rendering a medical diagnosis in the scope of their profession, it simply does not follow that a nurse would be qualified to render expert opinion as to a medical diagnosis in a court of law.

I agree *Flanagan* did not, as the majority states, "preclude the scientist's testimony in *McClain* because the scientist *was not a registered nurse.*" Majority Op., at 244, 971 A.2d at 1208 (emphasis in original). Additionally, *Flanagan* relied on *Miller* in carving out an exception to the normal test of expert competency as applied to nurses. *Flanagan*, at 185. *Miller* and *McClain* are easily distinguishable from cases invoking the Professional Nursing Law, such as *Commonwealth v. Jennings*, 958 A.2d 536 (Pa.Super.2008), which the majority cites in support of its holding. *See* Majority Op., at 248–49, 971 A.2d at 1210–11. However, a medical diagnosis was not at

issue in *Jennings*. *Jennings* found the *"nursing diagnosis"* at issue was "essential to the effective execution and management of the *nursing regimen.*" *Jennings*, at 540 (emphasis added).

The majority reasons expert testimony offered in a court of law does not implicate a nursing regimen—"there is no patient under treatment, no actual or potential health problem, no diagnosis or treatment, and no care is affected." Majority Op., at 248, 971 A.2d at 1210. In this context, however, as the majority concedes, a nurse would not qualify as an expert to offer testimony on medical diagnosis or causation in light of the MCARE Act. *Id.*, at 251 n. 8, 971 A.2d at 1212 n. 8 ("We recognize that our decision to overrule *Flanagan* may have limited impact in light of the legislature's enactment of the MCARE Act...."). Prior to this concession, the majority cites the MCARE Act as supporting its finding "[h]ad the legislature intended that the Professional Nursing Law supersede the common law and duly enacted rules with regard to the standard for admission of expert testimony, it could have expressly indicated this intention, as it subsequently did in its enactment of the [MCARE Act]...." *Id.*, at 247, 971 A.2d at 1210. In my view, the MCARE Act only serves to support *Flanagan's* reasoning that the Professional Nursing Law's limits extend to apply to nurses in the courtroom.

For the foregoing reasons, I would reverse the Superior Court and remand for reinstatement of the trial court's grant of a compulsory non-suit in Appellants' favor, pursuant to *Flanagan.*

Justice SAYLOR joins this dissenting opinion.