**Green v. Pennsylvania Hospital**

*James W. Sutton, III*, for plaintiff.

*Gary M. Samms* and *Ryan L. Leonard*, for defendant Steven A. Glasser.

*Michael O. Pitt, Brian M. Crosby* and *Tracie A. Vizza*, for defendant Eugene M. Lugano.

*Kathleen M. Chancler*, for defendants James Kearney, Kelly A. Carr, Lori Yakish, Silvia Aquino, Stella Barber, Contributors to Pennsylvania Hospital, Pennsylvania Hospital, Bora Lim and John D. Sprandio.

DIVITO, *J.*, April 15, 2013—This is based upon an appeal by Ronald Green as Executor of the Estate of Joseph Fusco ("plaintiff") from the court's order entered on August 12, 2012 denying Plaintiff's Motion for post-trial relief pursuant to Pa.R.C.P. 227.1 ("motion for post-trial relief"). For the reasons that follow, the order by the court denying the motion should be affirmed and the non suit verdicts in favor of defendants Pennsylvania Hospital. et al. ("defendants") should be affirmed.

## I. Background

Decedent plaintiff, Joseph Fusco ("decedent"), was taken to the Emergency Department of Pennsylvania Hospital on December 30, 2008 with complaints of shortness of breath, rapid breathing, and wheezing. Decedent was admitted to the intensive care unit of the hospital due to his symptoms and, after medication failed to ease the symptoms, he was intubated. He remained in

critical condition due to serious preexisting medical that included circulatory failure, respiratory failure, and an infection overwhelming his system. After being unable to be weaned from the ventilator, on January 9, 2009 a feeding tube and tracheostomy were performed on the decedent.

Following the tracheostomy, bleeding was observed from the site of the procedure, and emergency steps were taken to address the issue, including bronchoscopy, repeat intubation, and placement of chest tubes due to the development of subcutaneous emphysema. Despite these measures, on January 10, 2009. Decedent arrested and after several attempts to resuscitate him, he was declared dead at 6:36 P.M. of that day. The cause of death on his certificate of death noted the immediate causes as cardiac arrest due to chronic obstructive pulmonary disease and pneumonia, and airway obstruction.

Plaintiffs Ronald Green and Peter Fusco, brother of the decedent. filed suit in Philadelphia County in June of 2009, with the trial commencing in June of 2012. Prior to trial both plaintiff and defendants filed several motions in limine, which after oral argument on June 4, 2012 resulted in the effective claims being whittled down to a survival claim for damages due to pain and suffering during the approximate one and a half hour time period of resuscitation on January 10, 2009. On June 7, 2012 the court heard arguments on defendants' motion in limine to preclude the testimony of Kathleen Fleming, an expert witness proffered by the plaintiffs as an "informatics" expert, and the motion was granted. At the close of plaintiff's case that day, defendants moved for non suit. The plaintiff agreed that non suits should be entered on behalf of nurses Sylvia Aquino and Anthony Giorgio, and after hearing arguments

from both sides, the court then also granted non suit as to the other defendants, except Nurse Lori Yakish. On June 8, 2012 the court heard arguments regarding the defense counsel motion for Nurse Yakish to be granted non suit, which was granted. Subsequently, plaintiff filed a motion for post-trial relief which was denied on August 21, 2012.

Plaintiff then filed with the appellate court its statement of errors, discussed hereafter.

## II. Plaintiffs Matters Complained of upon Appeal

### 1. Non Suit as to the Vicarious Liability of Defendant Pennsylvania Hospital

Plaintiff complains that the court erred in granting non suit as to defendant Pennsylvania Hospital because of the negligent acts of doctor Nora Malaraise and other individuals. However, at trial the plaintiffs failed to adduce evidence that Dr. Malaraise was an agent of the hospital at the time of the incident. Though plaintiff's expert. Doctor Peter Salgo, opined that Dr. Malaraise deviated from the standard of care for the decedent, at no point did plaintiff present evidence that Dr. Malaraise was an agent of the hospital other than showing that she treated the decedent in the hospital's facilities. At all times before and during the trial, however, the Hospital denied that Dr. Malaraise was its agent.

The MCARE Act specifically covers the standards to be demonstrated in medical staff is the agent and/or employee of a hospital. Hospitals may be held vicariously liable for the acts of other health care providers through agency principles only if the evidence shows that, "a reasonably prudent person in the patient's position would be justified in the belief that the care in question was being rendered

by the hospital or its agents." MCARE Act. 40 P.S. § 1303.516 (a)(1). The Act further holds that "Evidence that a physician holds staff privileges at a hospital shall be insufficient to establish vicarious liability through principles of ostensible agency unless the claimant meets the requirements of subsection (a)(1)..." MCARE Act, 40 P.S. § 1303.516(b).

Despite these clear standards as to how vicarious liability of a hospital should be established as to the agency of treating medical personnel in the hospital setting, the plaintiff failed to offer any evidence with which to meet the standard. No staff of the hospital were called as witnesses to testify at trial as to how the agency structure of the hospital was set up regarding ENT physicians, such as Dr. Malaraise, in the hospital's facilities. Nor was Peter Fusco, decedent's brother, asked any questions or offered any testimony as to how Dr. Malaraise presented herself as to agency, or whether a reasonable patient would believe she was an agent of the hospital. Though the plaintiff argued that the testimony presented by witnesses Dr. Salgo, Nurse Pierce, and Dr. Glasser established vicarious liability, those witnesses only served to demonstrate that Dr. Malaraise was present and treating patients at the hospital, not that the type of agency relationship existed between her and the hospital that would give rise to it being vicariously liable. Further. Dr. Glasser's testimony actually highlighted the ambiguity of the relationship between the hospital and medical staff working therein, as it was the plaintiff, not the defendants, that specifically elicited testimony from Dr. Glasser that though he provided care at the hospital, he was employed by an entirely distinct entity and was not its agent. (N.T. 6/6/12 5:15-25, 6:1-21).

Given that plaintiff elicited no testimony as to the actual substance of the relationship between Dr. Malaraise and the hospital, that the hospital denied an agency relationship throughout the course of the trial, the plaintiff's failure to elicit any testimony as to whether a reasonable person in the decedent's position would have though Dr. Malaraise was an agent of the hospital, and plaintiff's own presentation of evidence that doctors and nurses at the hospital were, at least in some cases, agents of other entities, the court correctly granted non suit as to Pennsylvania hospital as plaintiff had failed to establish any basis on which to conclude that Dr. Malaraise or other medical personnel were employed by or agents of the hospital.

2. Non Suit as to Nurse Lori Yakish

In order to establish liability in a medical malpractice case, proving causation that the failure to provide the requisite standard of care was the cause in fact of the injury or death is necessary. Plaintiff failed to demonstrate that any action taken by or attributable to Nurse Yakish was the cause of decedent's death. a non suit was thus granted as to Yakish.

Testimony elicited from Dr. Peter Salgo, while stating that the bleeding of decedent after the tracheostomy demonstrated that the tracheostomy cuff needed to be inflated, never stated whose duty it was to inflated, never stated whose duty it was to inflate that cuff to prevent further bleeding. Plaintiff did elicit testimony from Dr. Salgo that given the bleeding, the standard of care would have been to inflate the cuff, however, as directly cited by the plaintiff in its brief in support of motion for post-trial relief, the notes of testimony explicitly show that whose duty it was to inflate the cuff was never asked and

never stated by Dr. Salgo. (N.T. 6/6/12 53:21-25, 54:1-5). Further, though Dr. Salgo was questioned regarding these deviations by Yakish, at no point did plaintiff's counsel ask and at no point did Dr. Salgo offer as testimony that Yakish's deviation were the cause for decedent's death.

Accordingly, since Dr. Glasser also never testified as to Yakish's actions creating the causation for decedent's death, and Nurse Pierce was precluded from testifying as to causation, there was no evidence or testimony that Nurse Yakish's action were the cause in fact of decedent's death. Since all of the necessary elements were not met, the court had no choice but to grant non suit as to Nurse Yakish as plaintiff had failed to establish a right to relief.

3. Non Suit as to Dr. John Sprandio

Next plaintiff argues that the non suit as to Dr. John Sprandio, an intern doctor, was incorrect. However, plaintiff failed to adduce any evidence from an expert witness that Dr. Sprandio breached any duty to the decedent or failed to provide an adequate standard of care.

For liability to be found as to Dr. Sprandio, a qualified expert witness was required to testify that he had deviated from the proper standard of care — testimony which could have potentially have been provided by Dr. Peter Salgo. In arguments over the initial motion for non suit as to Dr. Sprandio, however, plaintiff's counsel admitted in no uncertain terms that "I have the transcript...and even from my recollection. I do not believe that Dr. Salgo states that Dr. Sprandio did not reinflate the cuff in a timely fashion." (N.T. 6/7/12 143:22-25, 144:1).

Given that the transcript clearly evidences that no expert testimony was given regarding a failure to adequately meet

the standard of care by Dr. Sprandio to the decedent, and plaintiff's own admission that such testimony was never provided, the court cannot find s basis for this complaint of error. Counsel for plaintiff did argue that from the hospital records it was difficult to see what had been done at what times by whom, however, providing an excuse that events around the decedent's death were confusing, thus making it difficult to pinpoint liability, does not serve as a replacement for the expert testimony that would be necessary for liability to have been found as to Dr. Sprandio. Accordingly, non suit was correctly granted, since, as fully admitted by the plaintiff, its expert did not find a breach of the standard of care by Dr. Sprandio.

4. Preclusion of Testimony from Informatics Expert Kathleen Fleming

Plaintiff claims error in the preclusion of testimony by Kathleen Fleming as being an informatics expert regarding alleged spoliation issues as to hospital records. Fleming was properly precluded as the issue was a technical one as to dates and times of certain reports alleged to have been altered or deleted from the system used by the hospital. However, Fleming specifically stated that she had never before worked with the particular system used by the hospital (known as VISICU) as a nurse, had never analyzed or worked with it before in her capacity as an informatics consulting expert, and had never before seen the audit logs generated by VISICU. (N.T. 6/7/12 84:2-19). Likewise, when asked by the court as to what actually led her to believe that records had been altered, her answer was essentially that her belief was based upon pure speculation that seemed to have no relation to with the field of informatics. When asked what she meant as to the records being "altered." she stated, "I can't give

you specifically what was altered, nor by whom. I can only look at what the audit trail shows as people having documented and then trying to track it back to the medical record and not being able to find entries that support that notation in the audit log." (N.T. 6/7/12 90:1-7). In other words, some documents were missing and based solely on that, she assumed that the records had been targeted for destruction and/or alteration with the express intention of preventing them from being used by a party seeking to hold the hospital liable.

Based on this voir dire hearing the court found it appropriate to preclude her as an expert. In the first instance, the court was troubled that, as an expert, she was completely unfamiliar with the complex system in which she was supposed to apply her abilities as an expert on. While the court understands that knowledge of such systems may be be supplemented to an expert's pre-existing knowledge in a relatively short time, considering that plaintiff was making arguments regarding minutiae of an extremely complex system of reporting procedures, time keeping, and entry of records, the court found that a passing entry level knowledge of the system by Fleming was not enough given the seriousness of the conclusions she was alleging.

More troubling were those conclusions that Fleming stated she was going to testify to. Based on her answers to the court's questions, she had concluded based merely on the fact that of a few records out of many hundreds of pages of hospital records being missing, that the record had surreptitiously been altered. This leap in logic took it from the domain of expert testimony to pure unsupported assumption. Hence, given the fact that Fleming had no experience with the system she would be testifying

regarding and no evidence other than assumptions based on misplaced records that someone at the Hospital was altering records, the court properly precluded her testimony.

5. Preclusion of Factual Causation Testimony by Dr. Peter Salgo

The court finds no record of the preclusion of factual causation testimony of Dr. Peter Salgo. Indeed, in arguments before the court after Dr. Salgo's testimony. Plaintiff's counsel spoke at length about the causation testimony offered by Dr. Salgo before the jury and his unsuccessful attempts to link causation regarding the decedent's death to the actions of the Defendants. (N.T. 6/8/12 7:7-25, 8:1-25, 9:1). As such, The court finds no basis for this complaint.

6. Preclusion of Factual Causation Testimony by Nurse William Pierce

Though Nurse William Pierce was allowed to testify regarding the conduct of nurses present during decedent's time at the hospital, the court precluded his testimony as an expert regarding causation, which plaintiff complains of as error. The MCARE Act, however, specifically states, "Medical testimony, — An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications: (1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia." MCARE Act. 40 P.S. § 1303.512(b)(1).

Plaintiff had argued that *Freed v. Geisinger Medical Center*, 971 A.2d 1202 (Pa. 2009) allowed Pierce to

testify as to causation, however, Freed merely gives the court more leeway in determining whether a nurse may testify as an expert in regards to causation, with our Supreme Court specifically stating courts "should assess the competency of any expert witness under the standards [of] the MCARE Act, if applicable." *Freed*, 971 A.2d at 1214. Though the ruling specifically allowed that a nurse may be capable of testifying regarding causation, it did not specifically give a nursing experts blanket approval in all situations, else the court would not have specifically held that a nursing expert should be assessed under the MCARE's standards if proper.

Accordingly, because this was a medical professional liability actions against a physician and Pierce did not possess an unrestricted physician's license, he was properly precluded under the MCARE Act's requirements under § 1303.512(b)(1). If this had been a case, such as *Freed*, involving the causation of bedsores and whether poor nursing was a the cause of the bedsores. Pierce would have been free testify as an expert as to causation, However, since it involved liability against multiple physicians and nurses, it would have created an anomalous result to allow Pierce to testify as to causation as to the nurses, but claim he was incompetent to testify against the physicians for care that was in many places indivisible as to who was providing it. As this was the case, Pierce was properly allowed to testify regarding his expert opinion of the quality of care provided by the defendant nurses but not as to causation of decedent's death.

7. Preclusion of Peter Fusco Testimony Regarding Condition of Decedent

Due to the various motions and orders granted before

trial commenced, at the time of testimony, the only issue of damages remaining was pain and suffering. Accordingly, witness Peter Fusco was allowed to testify regarding his brother's care at the Hospital during the day of his death on January 10, 2009. Beyond those observations, however, given the scope of damages, the court found that testimony as to the state of the decedent's body after his death was unnecessary, irrelevant, and potentially prejudicial. Fusco's testimony was, thus, correctly precluded as, not being an expert, his lay opinion of what decedent's body looked like after death would have not addressed any pertinent issue in the trial as to decedent's prior pain and suffering

8. Preclusion of Video Animation of Medical Treatment Given to Decedent

The court properly excluded the presentation of video animation alleging to represent the two hours prior to the decedent's death in 34 seconds as redundant, irrelevant, and speculative. Pennsylvania Rule of Evidence 403 states, "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Based on it, the court precluded the evidence since its redundancy wasted time and the speculative nature of the video had the potential to confuse the issues and/or mislead the jury.

The court determined the video was redundant and irrelevant as the plaintiff had already been allowed to present multiple pieces of demonstrative evidence in the form of actual medical equipment as actually used on the decedent, including a tracheal collar, an inflatable

tracheal cuff, and two different sizes of endotracheal tubes. Given that these had been presented to the jury and a demonstration of their use and function already allowed, computer generated images crudely approximating those same devices and their function would have added nothing to the jury's knowledge and instead would have been merely less illustrative repeats of the same information.

Secondly, the video was speculative as it dramatically condensed the events into a tiny fraction of the time. In doing so the video both omitted numerous acts of medical treatment performed on the decedent as part of the medical care providers' attempts to keep him alive, and emphasized the acts seized on by the plaintiff as being the primary, if not only acts, that occurred during the time leading up to the decedent's death. Likewise, the video depicts various treatments enacted by the care providers as causing bleeding of the decedent. However, no autopsy was allowed to be performed on the decedent, thus, there was absolutely no basis other than speculation that such bleeding occurred. The video, thus, also had the potential to mislead the jury as it clearly showed bleeding and injuries completely unsupported by the evidence.

The plaintiff made much ado about how such computer generated videos have been ruled to be admissible as evidence. The court did and does completely agree that such videos may be admissible — the issue was whether this specific video was admissible. Based on the foregoing it was not and the court correctly precluded the video animation as it both repeated a less useful example of evidence already allowed to be presented to the jury, as well as containing material of questionable, if non-existent, factual and evidentiary basis.

### 9. Court's Behavior

The court, both now and at the time in which it reviewed plaintiff's brief in support of post trial relief, was unable to discover a single objection in the transcript in which any such objection was ever made on record during the course of the trial by the plaintiff regarding the court making the alleged gestures. Unhelpfully, plaintiff also failed to cite a single instance of it objecting to any alleged inappropriate gestures made by the court during the course of the trial in its brief in support of post trial relief, nor did it otherwise direct attention in the transcripts to where such alleged improprieties were supposed to have occurred. As plaintiff failed to offer any support to its complaint of error, the court had no choice but to deny the plaintiff's request for post-trial relief on the point.

### 10. Preclusion of Testimony Regarding Decedent's Prior Condition

As discussed under complaint 7, damages in the trial were limited to pain and suffering regarding the approximately one and a half hours before decedent's expiration. As decedent's physical state after his death as observed by a non-expert layperson was irrelevant to the issues to be charged to the jury, the decedent's condition prior to his hospitalization as observed by a non-expert layperson was irrelevant. Being a non-expert. Fusco could have provided no new or relevant testimony as to whether his prior condition would have affected his pain and suffering in the final hours of decedent's life. Accordingly, Fusco's testimony on that issue was properly denied.

### III. Conclusion

For these reasons, the order of August 21, 2012 denying

the plaintiff's motion for post-trial relief pursuant to Pa.R.C.P. 227.1 should be affirmed.