J-A07031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| BRENDA MEIXNER, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF CURTIS L. MEIXNER, DECEASED | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 1008 MDA 2023 |
| DANIEL KAMBIC, D.O. AND FAMILY PRACTICE CENTER, P.C. | : : | |

Appeal from the Judgment Entered July 13, 2023
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2019-CV-00434-MM

BEFORE:   STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: APRIL 24, 2024**

Brenda Meixner ("Appellant"), individually and as administrator of the estate of Curtis L. Meixner ("Decedent"), appeals from the judgment entered in the Court of Common Pleas of Dauphin County in favor of Appellees Daniel Kambic, D.O. ("Dr. Kambic") and the Family Practice Center, P.C. ("Family Practice Center") (collectively "Appellees") after a jury found Appellees were not negligent in their medical treatment of Decedent.  After a careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

The relevant facts and procedural history are as follows: On January 18, 2019, Appellant filed a civil complaint against Appellees raising claims of medical malpractice and seeking damages under Pennsylvania's Wrongful Death Act, 42 Pa.C.S.A. § 8301, and Survival Act, 42 Pa.C.S.A. § 8302.[1] Appellant, who was the wife of Decedent, averred that Dr. Kambic was an employee or agent of the Family Practice Center.

Appellant alleged that, on December 11, 2007, Decedent underwent a total right hip arthroplasty, which was performed by an orthopedic surgeon, Scott King, D.O., at the Pinnacle Health Community General Osteopathic Hospital ("Pinnacle"). Subsequently, Decedent was admitted to Pinnacle on December 29, 2007, and medical testing confirmed Decedent had a right lower extremity deep venous thrombosis ("DVT") and pulmonary embolism ("PE") in both lungs. During his hospitalization on December 29, 2007, Decedent received care from his primary care physician, Dr. Kambic, who administered Coumadin, an anti-coagulation drug. Having responded favorably to the anti-coagulation therapy, Decedent was discharged from Pinnacle on January 2, 2008, to the care of Dr. Kambic.

Appellant further alleged that, after Decedent's discharge from Pinnacle, Dr. Kambic continued to monitor Decedent's anti-coagulation therapy and prescribe Coumadin. By letter dated January 30, 2008, Dr. King informed Dr.

_____

[1] Decedent was survived by Appellant (his spouse), as well as his two sons.

- 2 -

Kambic that Decedent was going to undergo a left hip replacement surgery on March 25, 2008, at Pinnacle. Dr. King recommended that Decedent be taken off the Coumadin five days prior to surgery, as well as suggested that Dr. Kambic place a "Greenfield Filter"[2] prior to the date of surgery. On February 18, 2008, Dr. Kambic wrote an order for an "IVC filter placement for previous DVT/PE" to take place on March 18, 2008, at the Harrisburg Hospital. On or about March 10, 2008, Dr. Kambic ordered coagulation testing, which revealed Decedent's PT/INR[3] value was 1.7, which was slightly below the suggested therapeutic range for oral anti-coagulation therapy. On March 11, 2008, Dr. Kambic discontinued Decedent's Coumadin therapy.

On March 18, 2008, Dr. Jay Goodman of Quantum Imaging and Therapeutic Associates deployed a Bard G2 retrievable permanent caval filter into the infrarenal inferior vena cava of Decedent. Dr. Goodman's procedure notes indicate: "We will be happy to remove the filter in the future when the patient is well out of the left total hip arthroplasty perioperative period." Dr. Kambic received a copy of Dr. Goodman's procedure notes via fax on March 18, 2008.

Appellant averred that, on March 25, 2008, Decedent underwent surgery at Pinnacle for his left hip replacement, and thereafter, Dr. Kambic

---

[2] A "Greenfield Filter" is the trade name for a particular brand of inferior vena caval ("IVC") filter device.

[3] "PT/INR" refers to "Prothrombin Time/International Norm Ratio."

restarted Decedent's Coumadin therapy. On March 27, 2008, Dr. Kambic increased the Coumadin order from 5 mg to 7 mg. Decedent was discharged from Pinnacle on March 28, 2008, and he continued to follow up with Dr. Kambic for anti-coagulation therapy. On April 3, 2008, Decedent had a PT/INR of 3.3 while on a Coumadin, and on or about April 7, 2008, Dr. Kambic ordered an adjustment to Decedent's Coumadin dose.

Appellant asserted that, on October 6, 2008, Dr. Kambic discontinued the order for Coumadin, and in his progress notes, he indicated Decedent had a "Greenfield" filter placed prior to the left hip surgery, but he made no mention of having the filter removed. Dr. Kambic continued as Decedent's primary care physician from October 6, 2008, to August 24, 2017, when Decedent died. Dr. Kambic neither restarted anti-coagulation therapy nor sought to have the IVC filter removed from Decedent's inferior vena cava.

Appellant indicated that, on December 7, 2012, Decedent went to the emergency room at the Lancaster General Hospital complaining of chest pain. The records from this visit were faxed to Dr. Kambic on December 7, 2012, and to the Family Practice Center on December 10, 2012. Decedent was examined at the Family Practice Center on December 10, 2012; however, the records for this visit contain no reference to Decedent's history of PE, DVT, or IVC filter. During a visit to the Family Practice Center on May 9, 2017, Decedent raised the issue of the continued presence of the IVF filter with Dr.

Kambic's medical assistant, Katherine Key-Reid and/or resident Kaitlin Plummer, D.O.

Appellant averred that, on August 3, 2017, Dr. Kambic's office left a voicemail message regarding scheduling an appointment with Pinnacle. On August 10 and 15, 2017, Decedent received voice mail messages from a woman named Jessica, who worked in the radiology department of Pinnacle, seeking to schedule an appointment regarding the filter. On August 18, 2017, Decedent underwent a plain film x-ray at the Quantum Imaging and Radiology Clinic at UPMC Pinnacle Health Harrisburg Hospital for evaluation/consultation for possible IVC filter removal. The report from the x-ray indicated "one of the times of the inferior venal caval filter is directed cephalad and to the right in abnormal position. The other times are in normal position." Dr. Kambic reviewed the x-ray report on August 19, 2017, at 10:36 a.m.

Appellant averred that, on or before August 23, 2017, Decedent began experiencing respiratory distress and swelling in his lower extremities, and he contacted Dr. Kambic's office, which scheduled him for an office visit on August 24, 2017, at 1:30 p.m. On August 23, 2017, at 11:30 p.m., Decedent left home for his night shift job at XPO Logistics, and as he walked from the parking lot to the XPO building, he collapsed and died. A fellow employee discovered Decedent's body in the parking lot at 1:05 a.m. A subsequent autopsy found blood clots in both of Decedent's lungs, and the Lancaster

County Coroner's Office ruled that Decedent's death was attributed to complications from PE.

Based on the aforementioned allegations, in Count 1 of the complaint, Appellant raised claims of medical negligence against Dr. Kambic as it related to his failure to order the removal of the IVC filter, as well as ordering the discontinuation of anti-coagulation therapy. In Count 2, Appellant alleged Dr. Kambic acted within the scope of his employment with the Family Practice Center, and, therefore, the Family Practice Center was vicariously liable for Dr. Kambic's negligence.

On March 4, 2019, Appellees filed a joint answer with new matter, to which Appellant filed a reply.[4] On August 9, 2022, Appellees filed an *omnibus* pre-trial motion *in limine* seeking to preclude (1) testimony from Appellant's interventional radiology expert, Jon Davidson, M.D., as to causation (*i.e.*, that the failure to remove the IVC filter caused the PE, which caused Decedent's death); (2) evidence, testimony, or references at trial to Food and Drug Administration ("FDA") advisories/safety communications[5] regarding IVC

---

[4] On July 29, 2019, Appellees filed a motion for partial judgment on the pleadings; however, Appellees filed a praecipe to withdraw the motion on November 12, 2019.

[5] We note that, sometimes the parties refer to these documents as "FDA advisories," and sometimes they refer to them as "FDA safety communications." The 2010 FDA advisory is titled "Inferior Vena Cava (VC) Filters: Initial Communication: Risk of Adverse Events with Long Term Use." Plaintiff's/Appellant's Exhibit 8. The 2014 FDA advisory is titled "Removing
*(Footnote Continued Next Page)*

filters, which were issued in 2010 and 2014; (3) argument, testimony, or evidence in support of claims in the complaint that are not substantiated by Appellant's expert reports;[6] (4) evidence suggesting Decedent experienced conscious pain and suffering prior to his death; (5) the jury from viewing post-mortem photographs of Decedent taken at the scene of his death; (6) recovery by Appellant of certain economic losses related to health insurance expenses and mental health treatment; (7) evidence of hearsay statements contained within the Lancaster County Coroner's report; and (8) hearsay testimony from Appellant recounting alleged conversations with Harrisburg Hospital and Interventional Radiology staff.

On August 30, 2022, Appellant filed a response to Appellees' motion *in limine*, and on September 13, 2022, the trial court entered an order disposing of Appellees' motion *in limine*. Specifically, the trial court indicated:

> 1.     [Appellees'] motion to preclude [Appellant's] expert Dr. Jon Davidson from testifying at the time of trial is DENIED. The Affidavit provided by [Appellant] sufficiently expands on Dr. Davidson's original report, and [Appellees] did not file a Motion to

---

Retrievable Inferior Vena Cava Filters: FDA Safety Communication." Plaintiff's/Appellant's Exhibit 9.

[6] Specifically, Appellees requested Appellant be precluded from offering any argument or evidence as to her claims that (1) Dr. Kambic breached the standard of care by sending Decedent to interventional radiology to have the IVC filter placed in the first instance; (2) Dr. Kambic failed to supervise other employees of the Family Practice Center; and (3) any agents or employees of the Family Practice Center other than Dr. Kambic breached any applicable standard of care. Appellees asserted Appellant's expert reports did not establish a *prima facie* case for these assertions.

Compel a more thorough report after receiving Dr. Davidson's allegedly insufficient first report;

2. [Appellees'] Motion to preclude reference to FDA advisories regarding IVC filters is DENIED as presented. With the proper foundation and precise questioning, some of this information may be admissible. [Appellees] are at liberty to renew their objections at trial;

3. Upon agreement of the parties, [Appellant] is precluded from presenting any argument, testimony, or evidence in support of claims in the complaint that are not substantiated by [Appellant's] expert reports;

4. Upon agreement of the parties, [Appellant] is precluded from arguing or presenting evidence suggesting that Decedent experienced conscious pain and suffering prior to his death;

5. Upon agreement of the parties, [Appellant] is precluded from showing to the jury post-mortem photographs taken of Decedent at the scene of his death;

6. Upon agreement of the parties, [Appellant] is precluded from recovering lost insurance benefits for Decedent's sons after they turn 26 and from recovering payments from [Decedent's son's] mental health treatments, which pre-date his father's death.

7. [Appellees'] motion to preclude hearsay statements contained within the Lancaster County Coroner's report is DENIED if, and only if, the Lancaster County Coroner, Wayne Ross, M.D., testifies at trial. If Dr. Ross does not testify at trial, the statements in the Coroner's Report shall be precluded; and

8. [Appellees'] motion to preclude [Appellant] from testifying about conversations that she had with Harrisburg Hospital and interventional radiology staff is GRANTED. These conversations constitute inadmissible hearsay, and no exception applies to make them admissible. [Appellant] is precluded from introducing alleged conversations that [Appellant] had with staff from Harrisburg Hospital and interventional radiology.

Trial Court Order, filed 9/13/22, at 1-2.

The matter proceeded to a jury trial on December 12, 2022, at which

Appellant presented the testimony of Troy Swartz (the co-employee who

- 8 -

found Decedent's body in the parking lot), Michael Sweigert (a friend of Decedent and his family), Mary Sweigert (a friend of Decedent and his family), Richard Lewan, M.D.[7] (an expert witness board certified in family medicine), Andrew Verzilli (an economist), Michael Meixner (Decedent's son), Daniel Meixner (Decedent's son), Jon Davidson, M.D.[8] (an expert witness in interventional radiology), and Appellant (Decedent's wife).

In a nutshell, Appellant's trial theory was that Decedent died from a pulmonary embolus, which was caused by an indwelling IVC filter left in him for nine years. Specifically, Appellant averred a clot formed on the IVC filter itself, broke off, and traveled to Decedent's lungs. Appellant argued Dr. Kambic breached his duty of care by failing to refer Decedent back to the interventional radiologist for retrieval of the IVC filter, particularly given that Dr. Kambic discontinued Decedent's use of Coumadin.

Appellees, on the other hand, presented the testimony of Dr. Kambic, Gerald J. Hansen, III, M.D. (an expert witness in family medicine), Henry Rinder, M.D. (an expert witness in hematology, which involves the disorders of blood), and Ronald S. Winokur, M.D. (an expert witness in interventional radiology).

---

[7] Dr. Lewan's August 31, 2022, videotaped deposition was played for the jury. N.T., 12/12/22, at 125.

[8] Dr. Davidson's December 9, 2022, videotaped deposition was played for the jury. N.T., 12/12/22, at 239.

In a nutshell, Appellees' defense was Dr. Kambic did not breach any duty of care to Decedent, and, more specifically, he never deviated from the accepted standard of medical care as to Decedent. Specifically, Appellees averred the IVC filter placed in Decedent was designed and approved for permanent placement in the inferior vena cava. Further, Appellees averred it was the duty of the interventional radiologist to follow-up and remove the IVC filter, if needed, and not the duty of Dr. Kambic, who is a family physician. Further, Appellees disagreed with Appellant's theory of causation. Specifically, Appellees averred the blood clot at issue developed in an area of the body where the IVC filter could not catch it as opposed to forming around the IVC filter itself.

At the conclusion of the trial, the jury found Dr. Kambic was not negligent in his medical treatment of Decedent, and, thus, the Family Practice Center was not vicariously liable.[9] Consequently, the jury entered a verdict in favor of Appellees with no recovery for Appellant. Thereafter, Appellant filed a timely post-trial motion for relief and a new trial, and Appellees filed an answer in opposition thereto. After the parties filed briefs, by order and

_____

[9] The verdict sheet provided that, if the jury answered "No" to Question No. 1 ("Was Defendant Daniel Kambic negligent in his medical treatment of Curtis Meixner?"), then the jury should not answer Question No. 2 ("Was Daniel Kambic's negligence a factual cause of Curtis Meixner's death?"). Here, the jury answered "No" to Question No. 1, and, therefore, the jury made no determination regarding causation.

- 10 -

opinion entered on June 28, 2023, the trial court denied Appellant's motion for post-trial relief.

On July 13, 2023, judgment was entered in favor of Appellees, and on July 19, 2023, Appellant filed a timely notice of appeal. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant timely complied, and the trial court filed a brief statement in lieu of opinion referring this Court to the June 28, 2023, opinion.

On appeal, Appellant sets forth the following issues in the "Statement of the Questions Involved" (verbatim):

> 1. Did the trial court abuse its discretion in excluding relevant evidence bearing directly on the standard of care?
>
> 2. Did the trial court abuse its discretion in permitting defense counsel, who had a complete identity of interest, to each offer opening statements and closing arguments and cross-examine Plaintiff's experts[?]
>
> 3. Did the trial court abuse its discretion in declining to discharge the jury following the late-day jury charge on Thursday leading to an unjust verdict?
>
> 4. Did the trial court err in excluding causation testimony by Plaintiff's family medicine expert?
>
> 5. Did the trial court err in allowing Defendants' experts to offer opinions outside the fair scope of their reports?

Appellant's Brief at 3 (suggested answers and unnecessary capitalization omitted).[10]

_____

[10] We note that, unless otherwise specifically indicated, Appellant raised proper objections at trial, presented her issues in her post-trial motion for a new trial, and raised the issues in her court-ordered Rule 1925(b) statement.

- 11 -

In her first issue, Appellant claims the trial court abused its discretion in excluding relevant evidence bearing directly on the standard of care. Specifically, Appellant contends she is entitled to a new trial because the trial court excluded "highly relevant evidence of an FDA Safety Communication from 2010, which bore directly on the issue of the standard of care for the management of retrievable IVC filters like the one implanted in [Decedent] on the orders of Dr. Kambic." Appellant's Brief at 32. Appellant asserts the trial court's erroneous exclusion of this evidence "likely affected the outcome of the trial and warrants a new trial to correct the error." *Id.*

Initially, we note the following:

> Trial courts have broad discretion to grant or deny a new trial. The grant of a new trial is an effective instrumentality for seeking and achieving justice in those instances where the original trial, because of taint, unfairness or error, produces something other than a just and fair result, which, after all, is the primary goal of all legal proceedings. Although all new trial orders are subject to appellate review, it is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial.

***

> Each review of a challenge to a new trial order must begin with an analysis of the underlying conduct or omission by the trial court that formed the basis for the motion. There is a two-step process that a trial court must follow when responding to a request for new trial. First, the trial court must decide whether one or more mistakes occurred at trial. These mistakes might involve factual, legal, or discretionary matters. Second, if the trial court concludes that a mistake (or mistakes) occurred, it must determine whether the mistake was a sufficient basis for granting a new trial. The harmless error doctrine underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial

judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake.

To review the two-step process of the trial court for granting or denying a new trial, the appellate court must also undertake a dual-pronged analysis. A review of a denial of a new trial requires the same analysis as a review of a grant. First, the appellate court must examine the decision of the trial court that a mistake occurred.

\*\*\*

If the appellate court agrees with the determination of the trial court that a mistake occurred, it proceeds to the second level of analysis[, *i.e.* whether harmless error occurred].

*See Harman ex rel. Harman v. Borah*, 562 Pa. 455, 756 A.2d 1166, 1122-24 (2000) (citations, quotation marks, and quotations omitted).

If the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful....Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment.

*Detterline v. D'Ambrosio's Dodge, Inc.*, 763 A.2d 935, 938 (Pa.Super. 2000) (citations omitted).

Here, as indicated *supra*, Appellees filed a motion in *limine* to preclude Appellant from referencing or admitting into evidence two FDA advisories/safety communications regarding IVC filters. Specifically, Appellees sought to exclude FDA advisories, which were issued in 2010 and 2014. The trial court denied Appellees' motion *in limine* as to this issue; however, the trial court ruled Appellees could renew their objections to the introduction of the FDA advisories at trial.

Thereafter, prior to the introduction of Dr. Davidson's deposition at trial, the following relevant exchange occurred outside the presence of the jury:

ATTORNEY HAVERTY[11]: I was wondering about doing Dr. Davidson's transcript which we just got out electronically where I printed out because there are a couple of objections and—but not a lot but we need to deal with that. And it would be—if we have a hole later this afternoon, we want to play Dr. Davidson's deposition as well, we could push back to tomorrow if that's okay with the Court.

*** 

THE COURT: Okay. So, before we get into specific objections, let's talk about the FDA advisory. So, I'm starting now with the 2010 advisory. The only thing I have concerning the advisory is some sheets that you folks handed to me, it looks like marked probably in some deposition, Plaintiff's Exhibit 8 and Plaintiff's Exhibit 9. That's all I have. Maybe that's all there is. Right.

ATTORNEY HAVERTY: That is from the deposition I guess, the one that we have actually marked for trial.

THE COURT: This is all the information I have concerning any FDA advisory. Is there anything else?

ATTORNEY HAVERTY: Well, what we had marked for trial is Plaintiff's Exhibit 13 and—13A and 13B, which are the FDA advisories from 2010—August of 2010 and August of 2014. Those were discussed at Dr. Davidson's deposition on Friday.

THE COURT: He's the interventional radiologist?

ATTORNEY HAVERTY: He's the interventional radiologist.

*** 

THE COURT: I was given these back in September, right? Okay. So, let's start with the 2010. It says: Since 2005 the FDA has received 921 device adverse event reports involving these filters. Can you put that in perspective? What does that mean? Were there---let me better define my question. That would mean something if there were 950 devices ever implanted. It would mean something different if there were 50,000 of these implants—

---

[11] Kevin Haverty, Esquire, represented Appellant during trial.

devices implanted. Can you give me more perspective on the 921 number?

\*\*\*

[T]his first sentence says in 2005 the FDA received 921 device adverse event reports. I want to know in that time period or since 2005—or before 2005 how many of these devices were implanted countrywide, worldwide.

ATTORNEY HAVERTY: No idea.

\*\*\*

THE COURT: So, we don't know the 921, what significance that is.

ATTORNEY HAVERTY: We know it was significant to the FDA. That's the point.

\*\*\*

THE COURT: Well, let me go through it. I'm still going through this. So, in an opening paragraph they say that, you know, these events may be related to the retrievable filter remaining in the body for long periods of time beyond the risk for pulmonary embolism has subsided. Okay.

So, then in the second paragraph, it says the known long-term risks associated with the filters include but not limited to lower limb deep vein thrombosis. Did [Decedent] die of lower limb deep vein thrombosis?

ATTORNEY HAVERTY: He did not. Deep vein thrombosis is a risk factor for pulmonary embolism.

THE COURT: Right.

ATTORNEY HAVERTY: So, he died from pulmonary embolism which we allege, based on the expert testimony, was caused by a clot forming on the filter, a foreign body, and then breaking off.

THE COURT: Did it originate in the lower limb?

ATTORNEY HAVERTY: Perhaps—no, no. The argument is if it originated in the lower limb—Dr. Lewan testifies about this, the family practice doctor. The clot was so large that if it had originated in the lower limb it would have been trapped by the filter. The fact that it wasn't trapped by the filter—the filter was clean at the time of the autopsy—meaning that—that clot formed on the outside of the filter and broke off.

THE COURT: How does—a couple things. How do we know that the filter was so large—the clot was so large?

- 15 -

ATTORNEY HAVERTY: Because of the autopsy report. The autopsy report describes it as a large saddle embolism and Dr. Lewan categorizes that as a very large embolus that would not be expected to evade the filter if it had originated in the deep veins of the leg.

THE COURT: Okay. Filter fracture, did the filter fracture?

ATTORNEY HAVERTY: It did not fracture. One of the tines was bent.

THE COURT: I understand. So, filter migration, did it migrate?

ATTORNEY HAVERTY: We don't know. And doctor—Dr. Davidson addresses this in his deposition. Mr. Grill[12] cross-examined Dr. Davidson.

THE COURT: Well, we'll get to Dr. Davidson in a second. But, we don't know whether it migrated.

ATTORNEY HAVERTY: We don't know for sure.

THE COURT: Okay. Filter embolization.

ATTORNEY HAVERTY: That would be the filter itself moved and caused an embolism. The filter itself didn't embolize.

THE COURT: And IVC perforation?

ATTORNEY HAVERTY: That would be perforation of the inferior vena cava. That didn't happen.

THE COURT: Okay.

ATTORNEY HAVERTY: But, again, Your Honor, these are the ones that are known but it's not limited to those.

ATTORNEY BAKER[13]: That was the subject of our motion *in limine*.

THE COURT: I understand.

ATTORNEY BAKER: Okay.

THE COURT: And I partially ruled on it. Right? I said I'm going to listen to the question and answer—listen to how the question is worded[.]

ATTORNEY BAKER: Right.

---

[12] Daniel L. Grill, Esquire, represented Dr. Kambic during trial.

[13] Lauralee Baker, Esquire, represented the Family Practice Center during trial.

THE COURT: And that's what we're doing now. Let's see if the 2014 [FDA advisory] adds to anything. Does 2014 add anything new?

ATTORNEY HAVERTY: Yes, there is one thing new in 2014. Let me see if I can pull that up, Your Honor. Basically, they're reinforcing the same thing except that the audience now is expanded to include family practice doctors as well. But, also the FDA talks about in the second page of that—

THE COURT: What do you mean the 2014 expanded to family doctors?

ATTORNEY HAVERTY: The audience.

THE COURT: Where do you see that?

ATTORNEY HAVERTY: See where is says "audience," You Honor, near the top of the document?

THE COURT: Okay.

ATTORNEY BAKER: Medical specialties.

ATTORNEY HAVERTY: In the 2010 document the audience was emergency—sorry, emergency medicine and surgery.

THE COURT: Okay.

ATTORNEY GRILL: No mention of primary care, which is one of our arguments [for excluding the 2010 FDA advisory].

THE COURT: And, oh, and the audience expanded in '14. I see.

ATTORNEY HAVERTY: Right. And the FDA also—they noted [in the 2014 advisory] under recommendations similar to the 2010 [advisory]. And this is what's critically important is that the FDA recommends that implanting physicians and clinicians responsible for the ongoing care of patients with retrievable IVC filters consider removing the filter as soon as protection from pulmonary embolism is no longer needed. That's the same as they had in 2010. And then they go on to the FDA activity. Now they've got more data on these. And they note that the FDA developed a quantitative decision analysis using public available data available in the medical literature to assess whether there is a time period during the risk—during which the risk of having an IVC filter in place is expected to outweigh the benefits. And they go on to say: The decision analysis of retrievable inferior vena cava filters in patients without pulmonary embolism was published in…October 2013. And it says: The mathematical model suggests that if a patient's transient risk for pulmonary embolism is past, the risk-

slash-benefit profile begins to favor the removal of the IVC filter between 29 and 54 days after implantation.

That's new in 2014. Now they've got data. Now they're making recommendations about the specific time frame[.]

*** 

ATTORNEY HAVERTY: But the point is, let's assume the FDA has communicated to physicians. Now they're saying we have a window, we know what that window is, it's based upon data.

ATTORNEY GRILL: So how—

THE COURT: Go ahead.

ATTORNEY GRILL: How—a couple points….So, in 2014 a bulletin comes out which is not standard of care. They're trying to make it into standard of care. But a bulletin comes out. Dr. Kambic's testimony in deposition is he's never seen either of these [FDA advisories], so how can they apply to him? But if they do, what is he supposed to do with this recommendation in 2014? He's way outside this 29-to-54-day window. He can't go back to 2008 and say, oh, now the FDA is telling me in 2014—we're six years into this now.

ATTORNEY HAVERTY: Right. And Mr.—

THE COURT: Let him finish.

ATTORNEY GRILL: It doesn't apply….And if we want to go back to 2010, if the 2010 bulletin applies to retrievable IVC filters, the one that [Decedent] got we know from the product literature was a permanent retrievable, then we're not even talking about the 2010 bulletin about the same devices.

ATTORNEY HAVERTY: That's slightly incorrect, Your Honor. We are talking about the device that Dr. Goodman said was a permanent retrievable G2 Bard filter.

THE COURT: Goodman?

ATTORNEY HAVERTY: Goodman, he was the implanting physician. And he wrote to Dr. Kambic and said: "We successfully deployed a Bard G2 retrievable permanent device and will be happy to remove it when he's outside the risk period," which is exactly what the FDA is talking about in 2010. And as far as 2014 is concerned, [Decedent] didn't die for three more years. If Dr. Kambic had seen this in 2014, that would have been a good time for him to refer him to an interventional radiologist for removal of the filter.

ATTORNEY GRILL: So, what's the relevance of either of these documents?

ATTORNEY HAVERTY: It goes to causation. He didn't remove it in a timely fashion as he should have.

ATTORNEY GRILL: Can we just note, Judge, also the 2010 FDA documents we've referred to refers to retrievable IVC filters. I think you pointed that out. We kind of skipped over it but in the device discussion of the 2014 document, IVC filters are designed to be permanent implants although some of the devices may have the option to be removed.

THE COURT: Where are you reading from?

ATTORNEY GRILL: Sorry. On the first page under device, the last—

THE COURT: 2010?

ATTORNEY GRILL: '14.

THE COURT: Okay.

ATTORNEY GRILL: The final sentence under device.

THE COURT: Okay. Designed to be permanent. So, it says---this is where you got your reference in your opening from. IVC filters are designed to be permanent implants, although some may have the option to be removed. Right, is that what you're referring to?

ATTORNEY GRILL: Yes. And, so, the defense argument is even though we don't think this applies because Dr. Kambic didn't see it, at least for the first time we have the FDA talking about the same type of filter. The problem is now six years after the fact. So, Dr. Kambic—nobody can go back and take this thing out based on the 2014 FDA bulletin.

ATTORNEY HAVERTY: I'm sorry, what? You get alerted to the fact that this patient has a retrievable filter that's been in for six years and you can't go back and take it out? There's not even a referral to IVC—to IR to determine that? That makes no sense.

ATTORNEY GRILL: But your guy's testimony is it has to come out within the first two months but in no event later than 6 to 12 months.

ATTORNEY HAVERTY: That's the standard of care.

ATTORNEY GRILL: But you can't use an FDA bulletin as your standard of care. Because it's not.

ATTORNEY HAVERTY: Absolutely. Dr. Davidson testified that it is the standard of care.

THE COURT: Okay. Let's take a pause of a second.

∗∗∗

THE COURT: Back to where we were. So—

ATTORNEY GRILL: Can I have one thing?

THE COURT: Yes.

ATTORNEY GRILL: Apologies. So, looking through Dr. Davidson's transcript on cross-examination by defense counsel question: You will agree with me that the Instructions for Use document—on page 72—the Instructions for Use Document that you referred to indicates that the G2 filter which was used here is designed to act as a permanent filter. You would agree with that?

Answer: I would. All the filters released at that time were designed to be permanent filters.

THE COURT: Now, we talked about this I think in September when the issue was first raised that the FDA advisory lists certain complications, and I think the defense argued that those complications did not occur in this case.

ATTORNEY GRILL: Right.

THE COURT: Do you want to articulate that more?

ATTORNEY GRILL: Yes. We have the list of things the FDA's concerned about. But when you match up that list with the autopsy report, none of these were identified at autopsy. So, their experts are coming in and saying, well, we're going to speculate that it was one of these things issued in one of these bulletins but there's no proof of that.

ATTORNEY HAVERTY: Your Honor, that's a secondary issue. The primary issue is whether or not this FDA communication is the expression of the standard of care. And that's what the experts testified about is the standard of care expressed by the FDA was that when these—when the risk of pulmonary embolism has subsided, you should consider removing these filters. That's what these bulletins are being provided for.

As far as causation is concerned, the experts explain their theory about why this filter caused the pulmonary embolism that killed him. We are not relying upon the FDA for that, but the FDA is saying we—we've heard about these adverse events. We're concerned about the fact that these retrievable—these short-term filters, even though they may be designed to be permanent and even though they may have FDA approval to be permanent, we

don't think that they should be left in beyond the period of time when the risk of pulmonary embolism is acceptable.

THE COURT: You're saying the FDA advisory is the standard of care?

ATTORNEY HAVERTY: Yes.

THE COURT: You disagree?

ATTORNEY GRILL: Yeah. I mean, it doesn't say—it's an advisory bulletin. And the state of the art is still being developed here in 2022. So, what they're saying in 2010 and 2014 is new information that was not knowable in 2008. That's why they're issuing these advisories.

ATTORNEY HAVERTY: And Dr. Davidson testified that that's not true. It was known and knowable in 2008. The FDA simply reiterated it in communication. And by the way, the FDA characterized its 2014 communication specifically as a safety communication. So, this—the FDA is on this. And they—these filters, whether or not they were designed to be left in permanently or whether they were supposed to be retrievable, the FDA was understanding as it went on that these filters should be taken out as soon as reasonably practicable to avoid any possible complications. So, that's really what these communications are for. It's not about causation.

THE COURT: And the theory of the case for the plaintiff is that a blood clot formed at the filter?

ATTORNEY HAVERTY: On the filter.

THE COURT: And then migrated into his lungs and killed him.

ATTORNEY HAVERTY: Correct, broke off from the filter, migrated to lungs. Dr. Lewan testified it was such a massive—it caused instantaneous death it was so massive. That's not a clot that could have evaded the filter, so it had to come extra filter, had to come outside filter. And Dr. Davidson supports this same theory of causation.

But the FDA communication has nothing to do with that. [The] testimony is that this is a foreign body that was left in the patient's body when he was off of anti-coagulation, so he was at increased risk for this presence of this foreign body which should have been removed within six months of its implantation and wasn't. And there were multiple opportunities along the way to correct that and get it out of him before he died.

THE COURT: How do you respond to the blood clot was so large it had to come from here?

ATTORNEY GRILL: The plaintiff's experts are free to state their opinions but what I don't think they're free to do is to use irrelevant U.S. government documentation to wave and say, see, see, we told you. I don't need to repeat the arguments that we've already given.

\*\*\*

THE COURT: So, you're not suggesting the FDA creates a standard of care for a treating physician?

ATTORNEY HAVERTY: No. What I'm saying—what I'm suggesting is that the FDA gives this information to treating physicians so they can incorporate it into their practice, so they're giving them vital medical scientific information….[The FDA is] simply saying these have—these are the complications that have occurred with these people that have this in. And in the 2014 FDA communication they specifically mention now caval occlusion…which means a clot forms in the vena cava.

N.T., 12/12-12/15/22, at 87-93, 95-99, 101-04, 106-08, 141-42 (footnotes added).

After hearing argument, the trial court ruled that Dr. Davidson's testimony and the evidence regarding the 2014 FDA advisory was admissible; however, testimony and evidence regarding the 2010 FDA advisory was not admissible. *Id.* at 205. The trial court noted that, unlike the 2014 FDA advisory "the 2010 advisory does not discuss in any capacity blood clots." *Id.* at 206. Further, the trial court noted the 2010 advisory was not directed to family care physicians, such as Dr. Kambic. *Id.*

In explaining the reasons for its ruling, as well as the reasons it denied Appellant's post-trial motion for a new trial on this basis, the trial court relevantly indicated the following:

- 22 -

[Appellant] alleges that the [trial] court erroneously excluded a 2010 [FDA] communication concerning IVC filters. In 2010, two years after the IVC filter was implanted in Decedent, the FDA issued an initial Safety Communication regarding adverse events reports it had received that were believed to be associated with retrievable IVC filters remaining in people's bodies. This 2010 Safety Communication did not identify the adverse event that Decedent suffered as one that had occurred when an IVC filter remained in a patient's body. As such, the [trial] court excluded this Communication as irrelevant to the issues that the jury was to decide.

[Appellant] claim[s] that this 2010 Safety Communication was being introduced to show that the standard of care in 2010 was to remove the retrievable IVC filter as soon as protection from PE was no longer needed.[1]

---

1 The 2010 Safety Communication specifically recommended that "implanting physicians and clinicians responsible for the ongoing care of patients with retrievable IVC filters **consider** removing the filter as soon as protection from PE is no longer needed." Exhibit 10 to Plaintiff's[/Appellant's] Memorandum of Law in Support of Motion for New Trial (emphasis added).

---

However, these FDA Safety Communications do not necessarily constitute the standard of care as applied to doctors who implant these IVC filters. The Communication itself even indicated that it was up to the physicians' discretion as to whether or not to remove the IVC filters. Moreover, the 2010 Safety Communication was directed to emergency physicians and surgeons and not primary care physicians like Dr. Kambic, so there was no evidence that this Communication would even apply to Dr. Kambic. Therefore, the 2010 Safety Communication had very little probative value but had a high prejudicial effect because it raised concerns about IVC filters breaking or mitigating, which did not occur in the instant matter. Thus, under Pennsylvania Rule of Evidence 403, the 2010 Safety Communication was properly excluded as its probative value was outweighed by its prejudicial effect. Since [Appellant] failed to cite to any case law or other legal argument to show that this exclusion was "manifestly unreasonable, arbitrary, or capricious," [Appellant] cannot show that the [trial] court abused its discretion and is therefore not entitled to a new trial.

Regardless of the above, the FDA issued another Safety Communication in 2014 that did mention blood clots as a possible

adverse event if an IVC filter remains in a patient's body longer than necessary. This 2014 Safety Communication was specifically directed towards physicians who implant IVC filters and clinicians responsible for the ongoing care of patients with these devices, which would include Dr. Kambic. [The trial court] allowed this 2014 Safety Communication to be introduced into evidence and allowed witnesses to testify about it because it references the adverse event that Decedent suffered and was therefore possibly relevant to the issues in the case. The 2014 Safety Communication also recommended that the physicians and clinicians consider removing the IVC filter as soon as protection from PE was no longer needed. *See* Exhibit 2 to Defendants'[/Appellees'] Memorandum of Law in Opposition to Plaintiff's[/Appellant's] Motion for New Trial. As such, even if it was error to preclude the 2010 [FDA] Safety Communication, it was harmless error since the jury heard the recommendation set forth in the 2014 Safety Communication. Specifically, the jury repeatedly heard that the FDA recommended removal of IVC filters once the risk of PE had subsided based on the 2014 [FDA] Safety Communication, which was issued three years before Decedent's death. For these reasons, any potential error in excluding the 2010 Safety Communication was harmless, and [Appellant is] not entitled to a new trial on its exclusion.

Trial Court Opinion, filed 6/28/23, at 3-5 (emphasis in original).

Initially, we find the trial court did not abuse its discretion or err in excluding the 2010 FDA advisory on the basis it was irrelevant or, if relevant, its probative value outweighed the danger of unfair prejudice and confusion to the jury. *See Harman ex rel. Harman*, *supra*.

Pennsylvania Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

- 24 -

Pa.R.E. 401. However, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Here, as the trial court indicated, the 2010 FDA advisory was premised on reports of IVC filters breaking, moving out of position, or perforating; however, there was no evidence of this occurring in Decedent's case. *See* Plantiff's/Appellant's Exhibit 8. Rather, Appellant's theory at trial was that Decedent's IVC filter caused a massive blood clot to form on the filter itself. Moreover, as the trial court noted, the 2010 FDA advisory was directed to "emergency medicine, surgery" and not to primary care physicians, such as Dr. Kambic. *See* Plantiff's/Appellant's Exhibit 8. Accordingly, the trial court did not abuse its discretion in excluding evidence and testimony related to the 2010 FDA advisory under Pa.R.E. 402 and 403. *See Harman ex rel. Harman*, *supra*.

In any event, we note that, assuming, *arguendo*, the trial court erred in precluding evidence and testimony regarding the 2010 FDA advisory, such error was harmless. *See Detterline*, *supra*. Appellant asserts the 2010 FDA advisory was necessary for the jury to be informed that the standard of care, as defined by the FDA, was for retrievable IVC filters to be removed as soon as protection from PE was no longer needed, and, since the trial court excluded

the evidence of the 2010 FDA advisory, Appellant was prejudiced such that a new trial is warranted.

However, even assuming the FDA advisories set forth the standard of care, as alleged by Appellant, as indicated *supra*, the trial court permitted the introduction of, and testimony related to, the 2014 FDA advisory.  Both the 2010 and 2014 FDA advisory contain the following language under recommendation: "FDA recommends that implanting physicians and clinicians responsible for the ongoing care of patients with retrievable IVC filters consider removing the filter as soon as protection from PE is no longer needed."  Plantiff's/Appellant's Exhibit 8 and 9.  Accordingly, contrary to Appellant's argument, the jury was informed of this alleged standard of care via the 2014 FDA advisory. Thus, Appellant cannot demonstrate she has suffered prejudice, and Appellant is not entitled to relief.  ***Detterline***, 763 A.2d at 938 ("Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment.") (quotation marks and quotation omitted).

In her second issue, Appellant claims the trial court abused its discretion in permitting both Dr. Kambic's defense counsel (Attorney Grill) and the Family Practice Center's defense counsel (Attorney Baker) to offer opening statements and closing statements, as well as cross-examine Appellant's expert witnesses.

Specifically, Appellant avers Dr. Kambic and the Family Practice Center had a "complete identity of interest," and, therefore, the trial court improperly allowed "excessive duplication" when it permitted both defense attorneys to engage in the aforementioned aspects of trial. Appellant's Brief at 42-43. Appellant asserts "[t]he conduct of trial in this manner was improper." *Id.* at 47. Further, Appellant contends "[p]ermitting defense counsel to essentially duplicate their presentation to the jury was highly prejudicial under the circumstances and likely led to an unjust verdict." *Id.* at 48.

Initially, we note Appellant has not set forth any relevant authority in support of her second claim. *See* Pa.R.A.P. 2119(a) ("The argument shall [include]…discussion and citation of authorities as are deemed pertinent."). In any event, as the trial court indicated in rejecting Appellant's claim:

> "[A] judge has significant authority to 'police' the proceedings in his or her own courtroom….: *ACE Am. Ins. Co. v. Underwriters at Lloyds & Companies*, 939 A.2d 935, 948 (Pa.Super. 2007) (citations omitted). "It is axiomatic that the conduct of a trial is the province of the judge. His discretion, exercised without abuse, must control." *De Fulvio v. Holst*, 362 A.2d 1098, 1099 (Pa.Super. 1976) [(*en banc*)].
>
> ***
>
> In the instant matter, [Appellees] [Dr.] Kambic and the Family Practice Center were represented by two different attorneys who represented Dr. Kambic under two different insurance policies. Specifically, [Attorney] Grill represented Dr. Kambic for the time frame of the end of 2008 through October 2011, and [Attorney] Baker represented Dr. Kambic and Family Practice Center for the time frame of October 2011 through August 24, 2017.[2]

---

2 Dr. Kambic joined the Family Practice Center as an employed physician in October of 2011, and [he] switched insurance carriers at that point.

[Appellant's] claims of negligence covered the time frame of the end of 2008 through Decedent's death on August 24, 2017. The jury was advised that Attorney Grill represented Dr. Kambic and Attorney Baker represented the Family Practice Center. As such, the jury did not know that both attorneys represented Dr. Kambic during different time frames.

Both attorneys were permitted to present opening statements and closing arguments. Both attorneys also conducted direct and cross-examination of witnesses. [Appellant] did not present any evidence to suggest that the [trial] court's decision to permit both attorneys to participate was manifestly unreasonable or a misapplication of the law. Rather, this was an appropriate decision to allow both counsel to properly represent their respective interest.

Prior to the start of trial, the [trial] court properly advised both of [Appellees'] attorneys that they should prevent unnecessary duplication in their statements, arguments, and questioning….[Appellant has] failed to assert any specific errors that were allegedly committed by the [trial] court and is thus not entitled to a new trial.

Trial Court Opinion, filed 6/28/23, at 5-7.

We find no abuse of discretion. "The power to control courtroom proceedings includes the power to control the mode and order of examining witnesses and presenting evidence[.]" **Commonwealth v. Purnell**, 233 A.3d 824, 835 (Pa.Super. 2020). **See** Pa.R.E. 611 (indicating "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment.").

Here, determining whether to permit each named defendant to have its own separate counsel, and allow each counsel to participate at trial, falls within

- 28 -

the purview of the trial court's broad discretion. *See Commonwealth v. Falana*, 548 Pa. 156, 696 A.2d 126 (1997); *ACE Am. Ins. Co.*, *supra*. Appellant's suggestion the trial court allowed the wasting of time and/or interfered with the determination of the truth is speculative at best.

Moreover, even if the trial court should have limited the proceedings to one attorney to represent the interests of Dr. Kambic and the Family Practice Center, Appellant has failed to demonstrate prejudice. Aside from speculating the jury gave more weight to the defense's position because the defense was "backed" by two attorneys, whereas Appellant had one attorney, Appellant has presented no evidence of prejudice. *See Grove v. Port Authority of Allegheny County*, 655 Pa. 535, 218 A.3d 877, 890 (2019) ("Harmless error exists if the record demonstrates either…the error did not prejudice the [appellant] or the prejudice was *de minimis*[.] The standard is not that the [alleged error] could have influenced the jury. Prejudice is required.") (quotation marks and quotations omitted)). Accordingly, Appellant is not entitled to relief on this claim.

In her third issue, Appellant claims the trial court abused its discretion in declining to discharge the jury following the late-day jury charge on Thursday afternoon, which likely led to an unjust verdict. In support of her averment, Appellant points to the following exchange, which occurred outside the jury's presence just prior to the trial court's charge to the jury:

> ATTORNEY HAVERTY: I was talking to Mr. Grill. I didn't get a chance to talk to Ms. Baker about this, but I understand we're

about to charge the jury, and I'm guessing that the charge will probably take half an hour, 45 minutes maybe, which will put us to about 3:15. And I was wondering if the Court would entertain the idea of charging the jury and sending them home for the day, both in light of the late hour and also the weather conditions, which I understand are now turning slush, to begin their deliberations tomorrow.

THE COURT: No. I'm—I wouldn't be in the office tomorrow, so we're going to finish today. And, in fact, we'll even get them dinner if necessary. What I'm reading and hearing is the temperatures are going up

N.T., 12/12-12/15/22, at 635.

Appellant avers that, given the "relatively late hour and the weather,…the jury had no incentive to carefully deliberate the case and every incentive to return a quick verdict [in favor of the defense] without any true deliberation." Appellant's Brief at 49-50.

Initially, we note Appellant has not set forth any relevant authority in support of her third claim. *See* Pa.R.A.P. 2119(a) ("The argument shall [include]…discussion and citation of authorities as are deemed pertinent."). In any event, as the trial court indicated in rejecting Appellant's claim:

[Appellant] argues that it was an abuse of discretion to decline to discharge the jury for the day after charging the jury on a Thursday afternoon. Specifically, the jury was charged starting at 2:36 p.m. on Thursday, December 15, 2022, retired for deliberations at 3:03 p.m., and returned a verdict around 3:50 p.m. [Appellant] asserts that the fact that the jury retired for deliberations shortly after 3:00 p.m. likely led to an unjust verdict, but [she] has no evidence of this assertion. When there is no evidence to support an argument as to what a jury may have done under different circumstances, a party is not entitled to a new trial. *Raskin v. Ford Motor Co.*, 837 A.2d 518, 521 (Pa.Super. 2003). With no evidence, [Appellant] [is] asking the [trial] court to grant a new trial based on mere speculation as to what may

have happened. This is an improper basis for granting a new trial, and we will not do so here.

Trial Court Opinion, filed 6/28/23, at 7.

We find no abuse of discretion. "It is axiomatic that the conduct of a trial is the province of the judge. His discretion, exercised without abuse, must control." *De Fulvio*, 362 A.2d at 1099. Thus, it was within the trial court's discretion to direct the jurors to begin deliberations directly after the trial court's charge, notwithstanding the late hour or weather conditions, which the trial court characterized as improving.

Moreover, to the extent Appellant surmises she was prejudiced based on the amount of time it took for the jury to deliberate and reach a verdict (approximately fifty minutes), we note Appellant's averment is based on speculation. There is no evidence that the jury was motivated by the hour of the day and/or the weather in reaching a verdict. *See generally Raskin*, *supra*. In any event, as this Court has held:

Even if affected by the hour of the day [or the weather], the motive, if not corrupt, which induces jurors to acquiesce in a verdict is immaterial. Only in clear cases of improper conduct by jurors, evidenced by competent testimony, should a verdict that is supported by the evidence be set aside and a new trial granted.

*Johnson v. Frazier*, 787 A.2d 433, 436 (Pa.Super. 2001) (citations, quotation marks, and quotation omitted).

Here, there is no evidence to indicate that any of the jurors engaged in improper conduct or that any dissenting juror who then joined in the verdict

had a "corrupt motive." Thus, Appellant is not entitled to relief on her third claim.

In her fourth and fifth issues, Appellant presents claims related to causation. Specifically, in her fourth issue, Appellant contends the trial court erred in excluding causation testimony from her family medicine expert, Richard Lewan, M.D.[14] Appellant contends that, in his deposition testimony, Dr. Lewan expanded on his expert report and offered an opinion regarding causation, *i.e.*, Decedent's death resulted because of an embolism that formed on the IVF filter. However, she avers the trial court improperly granted Appellees' request to bar this testimony regarding causation.

Moreover, in her fifth issue, Appellant claims the trial court erred in allowing Appellees' expert, Henry Rinder, M.D., to offer an opinion outside the fair scope of his report. She contends that "for the first time at trial, [Appellees] were permitted to raise a causation theory not set out in any of their [experts'] reports." Appellant's Brief at 53. Specifically, she asserts that, beyond his report, Dr. Rinder was permitted to testify that Decedent had an "open wound" on his hand, which was observed during his last visit with Dr. Kambic, and the "fatal blood clot may have originated in [Decedent's] hand[.]"

_____

[14] Appellant admits Dr. Lewan was permitted to opine during trial "that defendant Dr. Kambic deviated from the acceptable standard of care by failing to refer the patient back to the interventional radiologist for retrieval of the IVC filter[.]" Appellant's Brief at 50-51.

*Id.* at 53-54. Appellant suggests it was error for the trial court to permit this testimony.

Initially, we note that the jury rendered a verdict in favor of Dr. Kambic (and the Family Practice Center) on the issue of duty/breach of duty.[15] The jury concluded Dr. Kambic did not deviate from the accepted standard of medical care as to Decedent. Thus, the jury did not reach the issue of causation, *i.e.*, whether any breach was the proximate cause of any harm suffered by Decedent.

Notably, in the memorandum in support of her post-trial motions, Appellant informed the trial court that issues regarding causation would need to be addressed only "if a new trial is granted" as to whether Appellees

_____

[15] To establish professional negligence against a medical provider, a plaintiff must prove the following elements: the defendant owed the plaintiff a duty; the defendant breached that duty; the defendant suffered actual harm; and the breach of that duty was the proximate cause of, or a substantial factor in bringing about, the plaintiff's harm. *See Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa.Super. 2004). Determining whether there was a breach of duty in a professional malpractice action entails two steps: first, a determination of the relevant standard of care, and second, a determination of whether the defendant's conduct met that standard. *Freed v. Geisinger Medical Center*, 910 A.2d 68 (Pa.Super. 2006) (citing *Toogood v. Rogal*, 573 Pa. 245, 824 A.2d 1140 (2003) (plurality)). "Furthermore, to establish the causation element in a professional malpractice action, the plaintiff must show that the defendant's failure to exercise the proper standard of care caused the plaintiff's injury." *Freed*, 910 A.2d at 72 (citation omitted). Generally, expert testimony is required in a medical malpractice action to establish several elements, including the proper standard of care, the defendant's failure to exercise that standard of care, and the causal relationship between the failure to exercise the standard of care and the plaintiff's injury. *Id.* at 72-73.

breached a duty of care to Decedent. Appellant's Memorandum in Support of Post-Trial Motion, filed 3/14/23, at 3. In its opinion denying Appellant's post-trial motions, the trial court declined to address the merits of Appellant's issues related to causation. Specifically, the trial court noted that Appellant indicated her argument regarding causation "would be relevant [only] if a new trial was granted" as to duty/breach of duty. Trial Court Opinion, filed 6/28/23, at 7. The trial court concluded that, "since [the trial court is] not granting a new trial, it is not necessary to address [Appellant's] remaining claims of errors." *Id.*

On appeal, Appellees request this Court not address the merits of Appellant's causation issues since Appellant acknowledged in the trial court that her issues regarding causation "were irrelevant if a new trial was not ordered" regarding Appellees' duty and breach of duty to Decedent. Appellees' Brief at 27. As we are not remanding for a new trial on the issue of duty/breach of duty and given how Appellant framed the issue for the trial court in its memorandum in support of her post-trial motion, we agree with Appellees that it is unnecessary for this Court to address the merits of Appellant's issues regarding causation. *See Chalkey v. Roush*, 757 A.2d 972 (Pa.Super. 2000) (*en banc*) (addressing preservation of issues in post-trial motions).

In any event, it's well-settled that "in order for a trial court's ruling on an evidentiary matter to constitute reversible error requiring the grant of a

new trial, the ruling must be both legally erroneous and harmful to the complaining party." **Parr v. Ford Motor Co.**, 109 A.3d 682, 697 (Pa.Super. 2014) (*en banc*). Where the error in the admission or exclusion of evidence had no effect on a verdict, the error does not require the grant of a new trial. *Id.* Here, although Appellant disputes certain rulings regarding expert testimony, which would have proved or disproved Appellant's theory of causation, as noted, the jury never reached the issue of causation. Thus, Appellant is not entitled to relief on her fourth and fifth issues. *Id.*

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/24/2024